RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0096p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

UNITED STATES OF AMERICA,

      *Plaintiff-Appellee,*

    *v.*

JAMES O. NAPIER,

      *Defendant-Appellant.*

No. 14-3492

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 1:13-cr-00016—Susan J. Dlott, District Judge.

Argued: April 28, 2015

Decided and Filed: May 20, 2015

Before: CLAY, KETHLEDGE, and DONALD, Circuit Judges.

───────────────

## COUNSEL

**ARGUED:** Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant. Benjamin C. Glassman, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee. **ON BRIEF:** Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Cincinnati, Ohio, for Appellant. Benjamin C. Glassman, UNITED STATES ATTORNEY'S OFFICE, Cincinnati, Ohio, for Appellee.

───────────────

## OPINION

───────────────

BERNICE BOUIE DONALD, Circuit Judge. A jury convicted James O. Napier of twelve counts of production, transportation, distribution, and receipt of child pornography. The charges against Napier stemmed from his sexual molestation of an 11-month-old baby and a 9-year-old girl, which he filmed and then traded on the Internet with others who share child

1

pornography.  Napier now appeals, asserting four distinct arguments: (1) the district court erred in denying his motion to dismiss the indictment, which was based on alleged prosecutorial misconduct; (2) the district court erred in denying his motion for judgment of acquittal, because the government failed to prove an interstate commerce connection for all twelve counts of conviction; (3) the district court erred in admitting at trial—over Napier's objections—various electronic devices as exhibits that included markings indicating the devices were manufactured outside of the United States and a document obtained from Time Warner Cable Company; and (4) the district court erred in denying his motion to vacate his conviction on the distribution-of-child-pornography charge, which was allegedly afflicted by a "fatal" variance and violated Napier's due process rights.  We **AFFIRM** the district court in all respects.

I.

A.

James O. Napier ("Napier") met Laura Schiele ("Schiele") when she was 19 years old. Napier was over thirty at that time and, according to Schiele, went by the nicknames "J-Kid" and "Kid."  Napier and Schiele began dating and soon moved in together.  In November 2008, the couple moved into an apartment on Sunset Avenue in Cincinnati, Ohio.

Napier and Schiele each had their own computers.  Schiele used an Acer computer while Napier used a computer tower that he got from his job.  Schiele was aware that Napier used his computer to, among other things, look at "regular" pornography.  Schiele also was aware that Napier had a foot fetish.

On November 9, 2009, Schiele's sister, Jennifer, called and asked Schiele to babysit her 11-month-old daughter ("Victim 1").  Schiele was unable to look after her niece, so she told Jennifer to call Napier to ask him to babysit until Schiele got off from work.  Alone with his girlfriend's niece that morning, Napier raped the child and recorded the abuse in photographs and a video.

Napier traded this video with other child pornographers via email.  For instance, using the moniker "Kid James" and the email address jonapier1992@gmail.com, Napier referred to this video as his "anal baby rape video."  When one of these trading partners informed Napier that he

had already received this video from another child pornographer called "Cyanide," Napier responded: "[T]hat's funny! I made this video myself and traded it with [C]yanide. [S]he's not two years old she's only one years old, but she was only 6 months when I filmed her. [I] don't know why [C]yanide listed her at 2 years old[.]" Another of Napier's trading partners wanted more pictures and videos of Victim 1 and also wanted to rape her himself. Over the course of several emails, Napier responded that he had made the video himself; had taken the photographs himself; and had traded the video "with a few people." Napier also repeatedly expressed that he was having difficulty making a new video because he "can't get [Victim 1] alone long enough to take new pics or make another movie yet."

One of the people with whom Napier sought to trade child pornography turned out to be FBI Special Agent Deidre Gotjen ("Agent Gotjen"), who was located in Phoenix, Arizona. Agent Gotjen is currently assigned to the Public Corruption Squad, where she works on cases involving violent crimes against children and human trafficking. As part of the Innocent Images National Initiative, Agent Gotjen worked to "combat the sexual exploitation of children on the [I]nternet." In the summer of 2010, Agent Gotjen received a tip that the website "EuroDisc" was advertising the sale of child pornography. She explored the website and verified that it offered child pornography, either for free or for sale. EuroDisc also included a link called "Guestbook," which "allowed . . . individuals who were on the site to communicate with one another." Guestbook "recorded the date, name, time, and oftentimes the e-mail address of the individual posting so that they could be contacted offline." In one Guestbook post in July 2010, a person posted the following message: "looking to TRADE videos and pics. [I] have nearly 100 videos and thousands of pics. [G]irls and boys all ages. [O]nly serious TRADERS reply. jonapier1992@gmail.com[.]" In other July 2010 postings advertising this email address, the poster identified himself as "Kid" and reiterated his interest in trading.

Using an assumed email address, Agent Gotjen emailed jonapier1992@gmail.com to say she was "serious" about trading. "Kid James" emailed in response, "[Y]es! [L]et's TRADE! [W]hat do you like?" After some back and forth, Agent Gotjen received an email from "Kid James" with a video file attached. The video, entitled "47.wmv," was a compilation of movies

depicting the sexual abuse of minors. Agent Gotjen sent back a corrupted video file; when "Kid James" realized he could not open the file, his communications with Agent Gotjen ended.

Agent Gotjen sought to determine jonapier1992@gmail.com's identity, first by subpoenaing Google (from whom she learned that jonapier1992's IP address was being accessed through Cincinnati Bell) and then by subpoenaing Cincinnati Bell (which led to a dead end). She then searched Google for the email address and variations thereof. This query led her to profiles on the websites FootFetishTube.com, AdultSpace.com, MySpace.com, Facebook.com, and Reunion.com. From these profiles, Agent Gotjen learned that jonapier1992 was most likely a 36-year-old man living in Cincinnati named James O. Napier. Agent Gotjen ultimately obtained Napier's license photo from the Ohio Bureau of Motor Vehicles, which matched photos from the websites she had searched on the Internet. Agent Gotjen then packaged up her work and sent it to the FBI's Cincinnati office.

Meanwhile, Napier continued living with Schiele while trading online with other child pornographers. For instance, in February 2011, he sent a number of videos with sexually explicit titles—including one entitled "6 months old.wmv"—to someone with the email address "mynothing13@yahoo.uk." In return, Napier asked, "Do you have any younger girls? (Very young?) (The younger the better!)."

Napier and Schiele broke up around March 2012. When he moved out of their apartment on Sunset Avenue, he took his computer tower with him and Schiele kept her Acer computer. Napier promptly moved into the home of Candace Allen ("Allen"), the mother of his 6-year-old son. Also living in the home were Allen's two other children by a different father, a 7-year-old boy and an 8-year-old girl ("Victim 2").

Shortly after Victim 2's ninth birthday, Napier began sexually abusing her and recording it. The details are horrific. Victim 2 identified herself as 9 years old in several of the videos. On November 23, 2012, Napier emailed a fellow child pornographer who had earlier expressed interest in trading full-length videos. Napier responded, "Sure[,] we can begin trading immediately[.] I just [sic] me a chubby 9yo[,] we've been having lots of fun[.]"

By this time, agents at the FBI's Cincinnati office had determined—after subpoenaing Time Warner Cable—that the person emailing with Agent Gotjen from jonapier1992@gmail.com had likely done so using an IP address accessed from an apartment on Sunset Avenue. Neither Napier nor Schiele still lived at this address. The apartment manager, however, provided agents with a forwarding address, at which the agents were able to locate Schiele. After meeting with agents, Schiele gave them her Acer computer. Special Agent Eric Proudfoot ("Agent Proudfoot") submitted the computer to forensic analyst Skip Burnham, asking him to "examine the computer for the presence of any images of child pornography, any references to the text string jonapier1992@gmail.com, and any text references to a particular file called 47.wmv."

Burnham found these references on the Acer computer. Burnham also found that several sequentially numbered photos taken with a Polaroid camera were missing from among the larger images on the computer. These images had been deleted, but traces of the images were left as thumbnails accessible to the computer's operating system. Burnham was able to recover the missing photos among the thumbnail images. The photos were of "a small child, an infant[,]" with an erect penis close to her mouth. Burnham reported his findings to Agent Proudfoot, who in turn again met with Schiele. Schiele identified the child as her niece. The agents then sought an arrest warrant for Napier and a search warrant for the jonapier1992@gmail.com email account.

The FBI arrested Napier on January 18, 2013. During his arrest, Napier had on his person two cellphones and a microSD memory card. These items, Napier's tower computer (which Allen provided to authorities), and the email account from Google were submitted for complete forensic analysis.

During a search of the Gmail account, Burnham found large photographs of Schiele's niece that matched the thumbnails on the Acer computer. He also found the video that Napier had made of himself abusing Victim 1; the video "was titled three different ways: 64.wmv, six-month-old.wmv, and movie two-year-old girl self-made.wmv." The account included a great deal of email correspondence between Napier and other child pornographers about trading child

pornography. It also included more than a dozen emails that Napier sent to himself, each attaching a video file that documented his sexual abuse of Victim 2.

The computer tower also held images matching those of the Acer thumbnails and the Gmail account, depicting Napier's abuse of Victim 1. Recovered from the microSD memory card was a reference to the video file "6 months old.wmv." One of the cellphones that Napier was carrying when he was arrested held photos matching those that Agent Gotjen had found in the AdultSpace.com profile for jonapier1992@gmail.com. The other cellphone used that address in its email inbox, and the phone contained a video, duplicative of one that Napier had emailed to himself in the Gmail account, depicting Napier's abuse of Victim 2.

B.

According to a subsequent order of the district court, the following transpired next:

> During his initial appearance in U.S. District Court [on the day of his arrest, January 18, 2013], Napier was appointed a Federal Public Defender. Napier was detained without bond and held in the custody of the United States Marshal's Service (USMS), which housed him at the Boone County Jail in Burlington, Kentucky. On February 6, 2013, the Government obtained the [original] indictment against Napier, which charged him with [twenty-three] counts including the production, distribution, and receipt of child pornography.

> In the meantime, on February 1, 2013, the Assistant United States Attorney (AUSA) assigned to Napier's case contacted Cincinnati Police Detective (CPD) Kelly Best, Personal Crimes Unit, first by email and then by telephone. On that date, the Cincinnati Police Department opened an investigation of Napier based on the alleged conduct underlying the production of child pornography counts in the Government's case. This resulted in criminal complaints being filed against Napier in Hamilton County, Ohio, on February 6, 2013. These complaints charged five counts of sexual conduct by Napier related to two minor victims and relate to the conduct charged in the original federal indictment at counts 1, 4, 7, 11, and 18.

> Also on February 6, 2013, the AUSA assigned to Napier's case met with the CPD detective and they discussed that the CPD detective would interview Napier. The AUSA then requested that Napier be moved from the Boone County Jail to the Hamilton County Justice Center. Napier was so transported the morning of February 7, 2013. Napier's attorney was not notified of the request to transfer or the transfer itself.

> Upon Napier's arrival at the Hamilton County Justice Center, he was almost immediately brought to an interview room where he was met by two CPD

detectives, who conducted an approximately hour and a half interview of Napier. During the course of the interview, Napier requested an attorney approximately seventeen times. Regardless, the officers continued to interview him. As a result, Napier made inculpatory statements to the detectives.

After the interview, Napier was moved to a cell in the Hamilton County Justice Center where he stayed until the next morning, February 8, 2013. On that date, he was removed from his cell and brought to a Hamilton County courtroom for a "bond hearing." However, at the time, Napier was in federal custody, and no writ was obtained from either a state or federal judge in order to secure Napier's appearance for the hearing. Napier was assigned a Hamilton County Public Defender on the morning of February 8, 2013, but that attorney had just a few minutes to meet with Napier before his "bond hearing" and tried unsuccessfully to waive Napier's appearance in court that morning, where media appeared with television cameras. After the "bond hearing," Napier was moved to a new cell where two investigators from the Hamilton County Children's Services arrived to interview him. It was during that interview that the Federal Public Defender learned of the situation and went to the Hamilton County Justice Center to stop the interview.

On February 15, 2013, the Government advised Napier's Federal Public Defender that CPD detectives had interviewed Napier on February 7, 2013 and provided an audio recording of the interview. The Government subsequently notified Napier that it may use the contents of his inculpatory statements to the officers during the Government's rebuttal at trial.

On October 11, 2013, Napier filed a motion to sever the counts against him and three separate motions to dismiss the indictment.[1] Relevant to this appeal is Napier's motion to dismiss the indictment based on the above-recounted facts. Specifically, Napier argued that the above-recounted series of events, "orchestrated by the government," "caused a substantial violation of his right to due process of law under the Fifth Amendment and his right to counsel under the Sixth Amendment" and "violated concepts of fundamental fairness and was shocking to the universal sense of justice." The government responded in opposition on October 25, 2013, and the district court held a hearing on Napier's allegations on November 12, 2013. The parties subsequently filed supplemental briefs.

---

[1]Napier moved the court to sever the trial of the counts associated with his abuse of Victim 2. He also moved to: (1) dismiss the indictment for violation of the Speedy Trial Act; (2) dismiss the counts charging him with production of child pornography on the theory that (a) the statute criminalizing that offense was beyond Congress' power under the Commerce Clause and (b) the statute was unconstitutionally vague and overbroad; and (3) dismiss the indictment on the ground that the transfer of his place of pretrial detention, interview by local police, and "bond hearing" in state court amounted to a "shocking violation of the universal sense of justice."

On January 3, 2014, the district court denied Napier's motion to dismiss. The court first found:

> Napier does not cite to any cases with facts remotely analogous to those here, and the Court cannot conclude based on the precedent before it that the government's conduct in this case—that is, as Defendant describes it, "intentionally participat[ing] in unlawfully transferring Mr. Napier out of federal custody and into state custody, interrogating Mr. Napier without counsel in a willful and egregious violation of *Miranda* and the Sixth Amendment, permitting Mr. Napier to appear at a state court hearing without obtaining the issuance of a writ from this Court or any state court judge, and parading him in front of the media circus that was occurring at the time surrounding this case"—rises to the level of conduct that warrants a dismissal of an indictment.

The district court found, however, that "the AUSA instituted Napier's transfer to Hamilton County so that CPD detectives could interview him and did not advise Napier's appointed attorney of this transfer," and that the AUSA's actions "demonstrate[d] poor judgment . . . as it was certainly foreseeable that an interrogation would take place." The district court further remarked "that the interview by CPD detectives, the public 'bond hearing' in Hamilton County Court, and the attempted interview by Hamilton County Children's Services all occurred while Napier was in federal custody is astonishing, perplexing, and clearly inappropriate."

The district court concluded that the AUSA's actions did not amount to a Fifth Amendment Due Process Clause violation because the AUSA "was not present during the interrogation during which CPD detectives did not heed Napier's requests for counsel, and she is not responsible for their conduct." But, because the AUSA's actions "laid the groundwork" for the CPD's conduct, the district court ruled that the appropriate remedy was to preclude the government's use at trial of "any evidence obtained during that February 7, 2013 interview by the CPD detectives for any purpose[.]" The court also determined that this was a sufficient remedy for the alleged Sixth Amendment violation as well.

Napier was ultimately charged, in a twelve-count superseding indictment filed on October 2, 2013, with nine counts of Production of Child Pornography, in violation of 18 U.S.C. § 2251(a) and (e);[2] one count of Transportation of Child Pornography, in violation of 18 U.S.C.

---

[2]Count 1 related to Napier's abuse of Victim 1 on November 9, 2009. Counts 2-9 related to Napier's abuse of Victim 2 in August, September, and November of 2012.

§ 2252(a)(1); and one count each of Distribution and Receipt of Child Pornography, in violation of 18 U.S.C. § 2252(a)(2).

Napier's case proceeded to a four-day trial beginning on January 13, 2014. After the district court denied Napier's motion for judgment of acquittal, the jury returned guilty verdicts against Napier on all counts. On May 13, 2014, the district court sentenced Napier to a term of imprisonment of 2,880 months. This represented 20 years on each of the counts to be served consecutively to one another, and was the sentence recommended by the presentence report. The district court entered judgment on May 20, 2014. Napier filed a timely notice of appeal that same day.

II.

Napier's central argument on appeal is that the district court erred in denying his pretrial motion to dismiss the indictment against him with prejudice as a sanction for the prosecutor's alleged misconduct. The Supreme Court has recognized that the Due Process Clause of the Fifth Amendment may require reversal of a criminal conviction where the governmental action involved "shocks the conscience" and offends "canons of decency and fairness." *Rochin v. California*, 342 U.S. 165, 169, 172 (1952). Similarly, the Supreme Court has indicated in dicta that outrageous government conduct outside the grand jury process can result in dismissal on due process grounds if such conduct is so outrageous that it violates "fundamental fairness" or is "shocking to the universal sense of justice." *United States v. Russell*, 411 U.S. 423, 432 (1973); *see also United States v. Allen*, 619 F.3d 518, 525 (6th Cir. 2010). This Court "reviews whether 'outrageous government conduct' is a valid basis for dismissing an indictment—a question of law—de novo." *United States v. Amawi*, 695 F.3d 457, 483 (6th Cir. 2012) (quoting *United States v. Tucker*, 28 F.3d 1420, 1421 n.1 (6th Cir. 1994)).

In the present case, the alleged government misconduct was the participation of one of the AUSAs in Napier's improper transfer out federal custody and into state custody. By extension, Napier argues, the AUSA's misconduct also includes the results of that transfer: the CPD's alleged violation of Napier's right to counsel under the Sixth Amendment and under *Miranda* when his repeated calls for counsel went unheeded.

Without explicitly saying so, Napier appears to argue that the AUSA's misconduct included not just initiating Napier's unlawful transfer into state custody, but also lying to the lower court about her role in the transfer—or, at minimum, "obfuscating" her role in the transfer. At Napier's February 11, 2013 arraignment, counsel to Napier informed the magistrate judge of the transfer. The magistrate judge specifically asked, "[D]o you know anything about this?" The AUSA replied:

> [AUSA]: Yes, Your Honor. He was erroneously taken to a state court proceeding. He has been in federal custody since the date of his arrest, which I believe was the 18th of January. So it was no fault of the [M]arshals, but he was erroneously taken to the state court proceeding without a writ.
>
> Once I was notified of that—and by the time I was notified of that, it was already too late—I contacted the state prosecutor's office and they've assured me that the appropriate paperwork and notation to his file is there so it won't happen again. He is in federal custody and he will not be making any more state appearances without the appropriate paperwork, Your Honor.
>
> THE COURT: So he will be returned to Boone County?
>
> [AUSA]: Well, Your Honor, that's—that is—he is in the [M]arshals' custody. They have beds in Boone, Hamilton, and Butler, and quite honestly, Your Honor, I could care less where he's housed.
>
> [DEFENSE COUNSEL]: I was actually told by the [M]arshals that he was transferred from Boone County to Hamilton County at the request of the U.S. Attorney's Office. So I don't know. If the government's in agreement with him going back to Boone County, that's certainly what we'd like to have happened.

Similarly, at a February 13, 2013 scheduling conference, the AUSA told the district court that the state court "made a mistake" in setting bond for Napier:

> [AUSA]: They were not supposed to take him. He has been in federal custody since the 18th, and he should not have been taken to a state court, to any state court proceeding. So that was a mistake that they made, and it will not be made again. He has since been moved to Boone County, I believe is what the [M]arshals told me, so it was their error.

Subsequently, at the November 12, 2013 hearing on Napier's motions to dismiss, defense counsel read into the record a CPD investigation report.[3] The unspecified author of the report averred:

---

[3]The report was provided to Napier during discovery. The report itself is not part of the record.

> I met with [the AUSA] to view the video of Mr. Napier and [Victim 1]. . . .  I also received a copy of the federal indictment detailing the 19 video clips Mr. Napier made of himself engaging in sex acts with [Victim 2]. . . .  I spoke with [the AUSA] regarding the transfer of Mr. Napier to Hamilton County to simplify matters in regards to my interviewing him and executing a search warrant for his buccal swabs and photos.  She will request the U.S. Marshals to transport him to the Hamilton County Justice Center on February 7, 2013.

Thus, Napier claims, the import of the report is that the AUSA minimized her role in Napier's transfer, if not outright lied to the magistrate judge and district court about it.

The government vehemently denies any misconduct by the AUSA.  Specifically, the government contends that both state facilities, the Boone County Jail and the Hamilton County Justice Center, are under contract with the federal government to house federal pretrial detainees.  Accordingly, the government argues, federal pretrial detainees like Napier can be summarily moved between such facilities, and a state writ of ad prosequendum is only required when a federal defendant is taken from federal custody to a state proceeding.  We need not resolve this dispute as to precisely when a writ is required in order to effectuate this kind of transfer.  Even assuming Napier is correct, nothing in the record supports his assertion that the charges against him should have been dismissed.

First, the district court properly found, when issuing its order denying the motion to dismiss, that the AUSA *had* initiated the transfer.  Thus, whatever "obfuscating" the AUSA may have done did not prevent the district court from making this factual finding in Napier's favor.  Further, if one accepts that the AUSA initiated the transfer (and even assumes the AUSA lied to the court about it), Napier has not demonstrated that AUSA's conduct rises to the "outrageous," "conscience shocking" level necessary to warrant the extraordinary remedy of dismissing the charges against him with prejudice—as the district court determined.  The district court properly found that even though it was "certainly foreseeable than an interrogation would take place" while Napier was in Hamilton County, the AUSA could not be held accountable for alleged constitutional violations committed by state agents and there was no record evidence that she personally participated in these alleged violations.  Further, Napier cites no authority for the proposition that a federal prosecutor can be held accountable for the misconduct of state agents, even when the prosecutor "la[ys] the groundwork" for that misconduct.  Napier also has cited no

authority for the proposition that such attenuated misconduct should result in the dismissal with prejudice of previously instituted criminal charges. The AUSA's *own* conduct—facilitating a transfer that may or may not have required a state writ of ad prosequendum, not notifying Napier's court-appointed counsel about the transfer, and allegedly lying to the court about it— was inappropriate, but it was not "conscience shocking." *See Breithaupt v. Abram*, 352 U.S. 432, 435 (1957) (reiterating that conduct "shocks the conscience" where it is "so 'brutal' and 'offensive' that it did not comport with traditional ideas of fair play and decency") (citing *Rochin*, 342 U.S. at 174); *see also Whitley v. Albers*, 475 U.S. 312, 327 (1986) (same).

Second, even though the district court did *not* find either a Fifth or Sixth Amendment violation, the court still took appropriate steps to sanction the "poor judgment on the part of the AUSA."[4] That sanction amounted to suppression of all evidence obtained by the CPD during Napier's February 7, 2013 interview. Suppression, not dismissal of charges with prejudice, is the remedy traditionally employed by courts to correct and deter the misconduct of government agents. *See, e.g.*, *Massiah v. United States*, 377 U.S. 201 (1964).

Indeed, the remedy fashioned by the district court actually went further than the law requires. Supreme Court precedent establishes that when an inculpatory statement is obtained in violation of the Sixth Amendment, it may not be used as part of the government's substantive evidence at trial, but may be used to impeach a defendant's false or inconsistent testimony. *See Michigan v. Harvey*, 494 U.S. 344, 345-46 (1990). Here, the district court not only precluded the government from using Napier's statements as substantive evidence, but also as impeachment evidence. This remedy was particularly apropos in light of the government's earlier indication to Napier that it would potentially use the contents of his inculpatory statements to the CPD officers during its rebuttal at trial. Suppression of this evidence thus eliminated the "substantial threat" of prejudice that Napier complained about in his motion to dismiss. Napier has not demonstrated—or, in fact, even argued—that the relief provided by the district court was

---

[4]Napier incorrectly argues that "[t]he district court found all of [the AUSA's] conduct to be 'astonishing, perplexing, and clearly inappropriate.'" Napier misconstrues the district court's order. The court stated: "Further, that *the interview by CPD detectives, the public 'bond hearing' in Hamilton County Court, and the attempted interview by Hamilton County Children's Services all occurred while Napier was in federal custody* is astonishing, perplexing, and clearly inappropriate."

insufficient to remedy the potential violation of his Fifth and Sixth Amendment rights for the purposes of his federal prosecution.

Third, and most importantly, Napier has not demonstrated any *actual* prejudice as a result of the AUSA's conduct. *See United States v. Morrison*, 449 U.S. 361, 365 (1981) (holding that, assuming *arguendo* that the Sixth Amendment was violated, "absent demonstrable prejudice, or substantial threat thereof, dismissal of the indictment is plainly inappropriate, even though the violation may have been deliberate") (footnote omitted). Napier conceded at oral argument that there is no compelling evidence of prejudice in this case. Napier has not pointed to anywhere in the record where the government used against him evidence obtained during his February 7, 2013 interview. Additionally, Napier does not argue that the evidence obtained during the interview has been admitted against him in the still-pending state-court proceedings. Even if the evidence has been admitted against him, this is an issue for Napier to litigate in the context of his state criminal case. Further, this issue is separate and distinct from the overwhelming evidence presented against him at his federal trial.

Finally, all of the cases Napier has cited in support of his position merely stand for the proposition that dismissal of the indictment *may* be an appropriate remedy in some circumstances. *See, e.g.*, *Rochin*, 342 U.S. at 172 (finding conscience-shocking conduct where deputy sheriffs illegally entered the open door of a house, forced open the door to the accused's bedroom, forcibly attempted to extract capsules that the accused swallowed, and directed a physician to pump the accused's stomach so that the capsules were vomited); *cf. Russell*, 411 U.S. at 431-32 ("While we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, the instant case is distinctly not of that breed.") (citation omitted). But the problem for Napier on appeal is the same as it was before the district court: "Napier does not cite to any cases with facts remotely analogous to those here, and the Court cannot conclude based on the precedent before it that the government's conduct in this case . . . rises to the level of conduct that warrants a dismissal of an indictment." This Court has never sanctioned the remedy requested by Napier for any pretrial conduct by a federal prosecutor, and this case will not be the first.

III.

Napier next contends that the district court erred in denying his motion for judgment of acquittal, which was premised on his assertion that the government failed to prove the interstate commerce element of the crimes charged. Each of the twelve charges—nine counts of production of child pornography, and one count each of transportation, distribution, and receipt of child pornography—included an element requiring an interstate commerce connection. *See* 18 U.S.C. §§ 2251(a), 2252(a)(1), 2252(a)(2). The district court, consistent with Napier's request at trial, instructed the jury that this element could be satisfied by proof that "the visual depiction or the production or transmission materials crossed a state line." In denying Napier's motion for judgment of acquittal, the district court explained: "[T]he Court finds that taking the evidence and the inferences most favorably to the government, a reasonable mind could fairly, if not conclusively, find guilt beyond a reasonable doubt. I think there was just overwhelming evidence by the government of everything, including the interstate commerce elements."

"We review *de novo* a challenge to the sufficiency of the evidence supporting a criminal conviction." *United States v. Carson*, 560 F.3d 566, 579 (6th Cir. 2009). In evaluating a sufficiency-of-the-evidence claim, we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). "'In undertaking this analysis, this court neither independently weighs the evidence, nor judges the credibility of witnesses who testified at trial.'" *United States v. Howard*, 621 F.3d 433, 460 (6th Cir. 2010) (quoting *United States v. Talley*, 164 F.3d 989, 996 (6th Cir. 1999)). "[T]he defendant bears a heavy burden when making a sufficiency of the evidence challenge." *Carson*, 560 F.3d at 580.

We find there is sufficient evidence for the jury to conclude that the government established the interstate commerce nexus. There is no support for Napier's contention that the government "failed to present any evidence on this element." During closing, the government devoted substantial time to outlining which of the government's exhibits and which witness testimony supported each of the twelve counts of conviction. Generally speaking, this evidence and testimony established that Napier was in Ohio when he recorded his sexual abuse of both

Victim 1 and Victim 2 (Counts 1-9). The interstate commerce requirement for each count was satisfied in at least one of three different ways. First, Napier shared the child pornography he created, through email, with other child pornographers and with Agent Gotjen. These recipients were all located outside of Ohio: as established either by direct testimony (in the case of Agent Gotjen) (Count 11), or by the technical features of the recipient's email communications (such as the timestamp) (Counts 1 and 10). At least some of these videos were taken using a cellphone, labeled as made in Taiwan, which had travelled in interstate commerce (Counts 2-9). Second, in one instance, Napier received child pornography from someone whose web domain and the content of his email suggested he was outside the United States (Count 12). Third, Napier emailed this pornography to himself from the Eastern Time Zone to the Pacific Time Zone (Counts 1-10).[5]

Simply put, the interstate commerce requirement is not as strenuous as Napier seems to think it is. The distribution count (Count 11) is the simplest to address, because there was direct testimony from Agent Gotjen establishing that she was based Phoenix at the time of her communications with Napier and there has been no suggestion by the defense that Napier was ever anywhere but Ohio. The other eleven counts rely on circumstantial evidence of interstate travel.

For each of the production counts (Counts 1-9) and the transportation count (Count 10), the government relies on email timestamps to prove interstate travel between the Eastern Time Zone and the Pacific Time Zone. Napier argues, without support, that "[t]he mere time stamp told the jury nothing, as a phone, computer[,] or other device can be set to any time zone in the world." This argument is unpersuasive. First, Burnham testified that the emails were sent from the Eastern Time Zone to the Pacific Time Zone, and that Ohio is not in the Pacific Time Zone.

---

[5]The government also asks this Court to consider a fourth avenue for establishing the federal jurisdictional nexus: Google recovered the child pornography Napier produced in Ohio from a search of computer servers in California. We will not address this argument for two reasons. First, we need not reach this argument in light of all the other evidence establishing an interstate commerce connection in this case. Second, an interstate commerce connection must be part of the offense itself, not something unilaterally created by the government after the fact. The government cannot claim the federal jurisdictional requirement is met simply because of actions the government itself took during the course of its investigation—here, directing a search warrant to Google for information regarding Napier's email account, and Google then accessing Napier's email communications through its servers and providing those emails to the government. The fact that Google was able to access Napier's emails in California is not convincing proof that the emails travelled in interstate commerce when Napier sent them. It merely establishes the unsurprising fact that Google can access all emails sent using its own servers. Further, the government has cited no cases for the proposition that its own investigatory conduct is sufficient to meet the jurisdictional requirement.

Napier, however, did not cross-examine Burnham[6] and did not present his own computer forensic expert. In the absence of any rebuttal evidence from Napier—such as proof that the time zone on the email account was incorrectly set by the recipient, as Napier now argues—the jury was entitled to credit Burnham's testimony. *See United States v. Torres-Ramos*, 536 F.3d 542, 556 (6th Cir. 2008) (noting that a reviewing court's analysis of a defendant's sufficiency-of-the-evidence claim "does not require the removal of every hypothesis except that of guilt").

At trial, the government also presented evidence that some, if not all, of the Victim 2 videos that Napier emailed were taken using a cellphone whose label indicated it was made in Taiwan (Counts 2-9).[7] Courts have held that the use of materials manufactured outside of the United States is sufficient to establish an interstate nexus. *See, e.g.*, *United States v. Grzybowicz*, 747 F.3d 1296, 1306-07 (11th Cir. 2014) (finding sufficient evidence of the interstate commerce element of production and possession of child pornography offenses where defendant's cellphone and laptop, which both contained pornographic images of children, were both manufactured outside the United States; the defendant took the pornographic images of the victim on his foreign-made cellphone; the defendant used the Internet to send the photographs to his email account; and the defendant downloaded at least two of the photographs onto his foreign-made computer); *United States v. Strausbaugh*, 534 F. App'x 178, 184 (3d Cir. 2013), *cert. denied*, 135 S. Ct. 99 (2014) (finding sufficient evidence supported defendant's conviction for possession of child pornography where the camera the defendant used to take photographs was manufactured in Korea); *United States v. Koch*, 625 F.3d 470, 479 (8th Cir. 2010) (finding government had established that child pornography possessed by defendant on his computer and flash drive had been transported in interstate commerce or produced using such materials by showing that defendant's computer and flash drive had been manufactured in China).

Nonetheless, Napier argued during closing, and argues again on appeal, that the government must prove where the recipient of any particular email was physically located when the email transmission was received. This is not the relevant inquiry. The relevant inquiry is whether there is enough circumstantial evidence that these electronic communications were

---

[6]Napier's counsel did repeatedly raise the interstate commerce issue at sidebar during Burnham's testimony, which ultimately led to the district court qualifying Burnham as an expert witness.

[7]Conversely, Burnham testified that the Victim 1 video was made using a Polaroid camera.

transmitted through interstate wires.  Given the omnipresent nature of the Internet, this is not a difficult burden for the government to satisfy.  *See United States v. Mellies*, 329 F. App'x 592, 605-07 (6th Cir. 2009); *see also United States v. MacEwan*, 445 F.3d 237, 244 (3d Cir. 2006) ("[W]e conclude that because of the very interstate nature of the Internet, once a user submits a connection request to a website server or an image is transmitted from the website server back to user, the data has traveled in interstate commerce."); *United States v. Hilton*, 257 F.3d 50, 54-55 (1st Cir. 2001) ("[P]roof of transmission of pornography over the Internet . . . satisfies the interstate commerce element of the offense," which the government satisfied through testimony from a computer forensics agent that images had "likely" been downloaded from the Internet because the storage disk "contained software used in conjunction with Internet chat rooms."); *United States v. Runyan*, 290 F.3d 223, 239 (5th Cir. 2002) (joining the First Circuit in holding that "[t]ransmission of photographs by means of the Internet is tantamount to moving photographs across state lines and thus constitutes transportation in interstate commerce") (alteration in original) (internal quotation marks omitted); *United States v. Harris*, 548 F. App'x 679, 682 (2d Cir. 2013) (same); *United States v. White*, 2 F. App'x 295, 298 (4th Cir. 2001) (per curiam) (same).  In the present case, we find that Napier's use of the Internet, coupled with the varying timestamps indicated on his emails, is sufficient to satisfy the federal jurisdictional nexus.

The same analysis holds true for the receipt charge (Count 12), which concerned child pornography Napier received on September 13, 2010, from someone using the email address DirtyHarry@o2email.co.uk.  The relevant inquiry is not, as Napier argued at trial, whether the government proved that "Dirty Harry" was physically located in the United Kingdom.  The relevant inquiry is whether Dirty Harry's email address is sufficient circumstantial evidence that Dirty Harry's email communications to Napier were transmitted through foreign and interstate wires.  Given that Dirty Harry's email address indicates that Dirty Harry's cellular or internet service is provided by O2—a telecommunications company whose service is not available in the United States but is widely available in the United Kingdom—the jury could reasonably find the government had satisfied the jurisdictional requirement on this count.

IV.

Napier next argues that the district court erred in admitting the following evidence at trial: (1) a document from Time Warner Cable, obtained pursuant to a government subpoena, showing that the email address jonapier1992@gmail.com was accessed at the Sunset Avenue address and that Napier was the subscriber of the account; and (2) the two cell phones, microSD card, and Schiele's Acer computer—all of which bore markings indicating they were manufactured outside of the United States. On appeal, Napier contends admission of the Time Warner document and the electronic devices violated his rights under the Confrontation Clause. At trial, however, Napier objected to the devices' admission solely on hearsay grounds. The district court found the Time Warner document was not hearsay, and was only being admitted to demonstrate the FBI's investigation. The court also immediately provided a limiting instruction to the jury to that effect. As to the electronic devices, the district court found the markings were not hearsay, and that the relevant witnesses were only reading what the markings said (which the jury could do for itself).

We review a district court's evidentiary rulings under the abuse of discretion standard, *United States v. White*, 492 F.3d 380, 398 (6th Cir. 2007), and find the district court correctly admitted the Time Warner document. The Confrontation Clause prevents the government from relying on out-of-court, testimonial statements to establish the truth of the matter asserted. *Crawford v. Washington*, 541 U.S. 36, 50-51, 59 n.9, 68 (2004). The document here was not offered for the truth of the matter asserted. Rather, the document was plainly offered during the testimony of Special Agent Pamela Kirschner to demonstrate how the Cincinnati Office of the FBI located Napier. They first received Agent Gotjen's investigatory file, and then subpoenaed Time Warner Cable. Time Warner's response (the document in question) then led the agents to the Sunset Avenue address, which led them to the apartment manager, who gave them Schiele's forwarding address, where the agents located Schiele, who gave them her computer, which led to the recovery of images of child pornography, which led to Schiele identifying her niece in these images, which led to Napier's arrest. Thus, this exhibit was offered for the limited purpose of showing the course of the agents' investigation, and the district court properly gave a limiting

instruction to that effect. It was not, as Napier claims, "offered for the truth that Napier resided at the residence during the relevant time period."

We also find that admission of the two cell phones, microSD card, and Acer computer did not violate the Confrontation Clause. The district court presumed the government was not offering the manufacturer labels on these devices as proof of travel in interstate commerce. The government's reference to the phones' country of manufacture during closing, however, would seem to call into question the district court's presumption. At trial, Napier framed admission of this evidence as a violation of the rule against hearsay. Napier's hearsay objection was itself a restatement of his general argument that the government had failed to establish the federal jurisdictional requirement. On appeal, Napier attempts to reframe this issue as a violation of the Confrontation Clause. We find Napier's hearsay objection insufficient to preserve the constitutional claim he is now asserting, and therefore apply plain error review. *See United States v. Hadley*, 431 F.3d 484, 498 (6th Cir. 2005) ("Because Defendant raised only a hearsay objection to these statements at trial, and did not challenge their admissibility on constitutional grounds, our review here is governed by the plain error standard.").

"Under this standard, we may correct a purported error that was not raised at trial only if there is '(1) error, (2) that is plain, and (3) that affect[s] substantial rights.'" *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 467 (1997)) (alteration in original). The Confrontation Clause bars the "admission of *testimonial* statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53-54 (emphasis added). Thus, "[t]o trigger a violation of the Confrontation Clause, an admitted statement must be testimonial in nature, and must be hearsay—that is, a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." *United States v. Deitz*, 577 F.3d 672, 683 (6th Cir. 2009) (internal quotation marks omitted).

Regardless of whether the manufacturer labels are hearsay, they are at most non-testimonial statements, which are not barred by the Confrontation Clause. A testimonial statement is (1) "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact," *Crawford*, 541 U.S. at 51 (alteration in original) (quoting 2 N. Webster, An

American Dictionary of the English Language (1828)); (2) "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," *id.* at 52 (quoting Brief for National Association of Criminal Defense Lawyers et al. as *Amici Curiae* at 3, *Crawford v. Washington*, 541 U.S. 36 (2004) (No. 02-9410), 2003 WL 21754961, at *3); and (3) having "a primary purpose of creating an out-of-court substitute for trial testimony" or "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution," *Michigan v. Bryant*, 131 S. Ct. 1143, 1155, 1165 (2011) (internal quotation marks omitted). Here, the labels on these electronic devices bear none of these hallmarks of testimonial statements.

Accordingly, Napier has not established any plain error in the district court's admission of these exhibits.

V.

Finally, Napier argues that his conviction on the distribution charge (Count 11)—relating to the compilation of child pornography Napier sent to Agent Gotjen on July 25, 2010—should be vacated because "the [g]overnment relied on evidence wholly different that that passed upon by the grand jury." Napier claims that, because the petit jury heard different evidence on the distribution charge than did the grand jury, either a due process violation or a "fatal" variance resulted.

Napier's argument is difficult to follow. He argued at trial—in the context of his motion for judgment of acquittal—and now again on appeal that the evidence presented to the grand jury was somehow "different," but provides little elucidation as to what that evidence was or how it differed from the evidence presented at trial. Napier's argument appears to be that the evidence the government presented at trial—the "47.wmv" compilation video—was never presented to the grand jury. Rather, Napier alleges, the government argued before the grand jury that on June 25, 2010, he traded child pornography on RapidShare.com. The district court understood Napier's argument as follows: "It seems to me that what you're saying is that . . . when the government proves probable cause in front of the grand jury, it has to present its entire case there; and if it deviates in any way from its case between the grand jury and the petit jury . . . th[en] there is a

problem." The district court rejected this argument, finding it "irrelevant" what evidence the government produced before the grand jury. (*Id.*)

Napier did not raise his due process argument before the district court. The panel therefore reviews for plain error. *Hadley*, 431 F.3d at 498. Napier cites no evidence that the offense charged in the indictment is different from the offense charged at trial. Instead, Napier offers nothing but his own unsupported factual allegations. This is insufficient under any standard of review, and especially so under plain error review. But even assuming Napier is correct, and that the evidence does not "match," this does not undermine the validity of the indictment or the jury's conviction. And, as the district court noted, Napier cites no authority for the proposition that due process requires that the evidence at trial exactly match the evidence presented to the grand jury.

Napier implicitly argues that he committed more than one distribution offense on June 25, 2010. From this he concludes that, because the evidence allegedly does not "match," he "has no ability to plead [d]ouble [j]eopardy as to either offense under this record." Napier's contention is illogical. As the government argues: "If, as he seems to suggest, he committed two different violations of the same statute on the same day but was tried for only one of them, the violation for which he was convicted is the one for which he cannot be tried again." Further, as the district court noted, Napier could have asked for a bill of particulars in order to clarify his confusion. He did not do so.

Conversely, Napier did raise his "fatal" variance argument before the district court. Accordingly, we review de novo whether there was a variance between the indictment and the proof offered at trial. *See United States v. Bearden*, 274 F.3d 1031, 1039 (6th Cir. 2001). Variances "are not *per se* prejudicial," *United States v. Budd*, 496 F.3d 517, 521 (6th Cir. 2007), or "fatal" in Napier's parlance. Rather, reversal is warranted only where a defendant proves (1) that a variance occurred, and (2) that the variance affected the defendant's substantial rights. *United States v. Prince*, 214 F.3d 740, 757 (6th Cir. 2000). A variance "occurs when the charging terms [of the indictment] are unchanged, but the evidence at trial proves facts materially different from those alleged in the indictment." *Id.* at 756-57 (alteration in original) (internal quotation marks omitted). The substantial rights of the defendant "are affected only

when the defendant shows prejudice to his ability to defend himself at trial, to the general fairness of the trial, or to the indictment's sufficiency to bar subsequent prosecutions." *United States v. Hynes*, 467 F.3d 951, 962 (6th Cir. 2006) (quoting *United States v. Barrow*, 118 F.3d 482, 488-89 (6th Cir. 1997)).  Here, Napier has identified no difference between the indictment's terms and the evidence at trial.  Moreover, he has not identified any prejudice.

Accordingly, we find there was neither a due process violation nor a prejudicial variance.

VI.

Based on the foregoing analysis, we **AFFIRM** Napier's convictions in all respects.