RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 24a0230p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────────

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

ANTOINE THOMPSON,

*Defendant-Appellant*.

No. 23-5503

─────────────────

Appeal from the United States District Court for the Eastern District of Kentucky at London.
No. 6:19-cr-00022-1—Robert E. Wier, District Judge.

Decided and Filed:  October 9, 2024

Before: McKEAGUE, MURPHY, and BLOOMEKATZ, Circuit Judges.

─────────────────

## COUNSEL

**ON BRIEF:**  Willis G. Coffey, COFFEY & FORD, Mt. Vernon, Kentucky, Patrick F. Nash, NASH MARSHALL, PLLC, Lexington, Kentucky, for Appellant.  Charles P. Wisdom, Jr., Amanda Harris Huang, UNITED STATES ATTORNEY'S OFFICE Lexington, Kentucky, for Appellee.

─────────────────

## OPINION

─────────────────

PER CURIAM.  Antoine Thompson appeals his conviction and sentence for murdering a fellow inmate while imprisoned.  He argues that (1) the exclusion of his experts' testimony was improper; (2) his charge under 18 U.S.C. § 1118 for murder while "under a sentence for a term of life imprisonment" should have been dismissed because the underlying life sentence is unconstitutional; and (3) the medical examiner's testimony violated his Confrontation Clause rights.  For the reasons stated below, we affirm.

**BACKGROUND**

In 1999, a jury in the District of Columbia found Thompson guilty of several crimes he committed as a juvenile, including conspiracy, four counts of assault with intent to kill while armed, four counts of aggravated assault while armed, possessing a firearm during a crime of violence, possessing a prohibited machine gun, possessing an unregistered firearm, and unlawfully possessing ammunition. The Superior Court of the District of Columbia sentenced Thompson to an aggregate prison term of 127 years and eight months to life.

Thompson was serving his sentence in a federal prison in Kentucky when, in 2014, he stabbed Courtney Jones, another inmate, seventeen times with a sharpened piece of metal. Jones could not move after the attack, so prison staff laid him on a backboard and took him to the prison's medical unit. When first responders arrived, they sedated Jones before transporting him to the hospital because he was in significant distress. Jones had no heartbeat or pulse when he was eventually taken to the hospital, and hospital staff could not revive him. Jones was pronounced dead about two hours after the attack.

Thompson was indicted for first-degree murder, in violation of 18 U.S.C. § 1111; murder by a federal prisoner while "under a sentence for a term of life imprisonment," in violation of 18 U.S.C. § 1118; and possessing a prohibited object, in violation of 18 U.S.C. § 1791(a)(2). Thompson moved to dismiss count two of the indictment—the § 1118 count—arguing that his underlying life sentence is unconstitutional. After he was sentenced by the D.C. court, the Supreme Court decided multiple cases that restrict courts' ability to sentence a juvenile to life without parole. *See Graham v. Florida*, 560 U.S. 48, 82 (2010) (holding that the Eighth Amendment prohibits a sentence of life without parole for a juvenile who did not commit homicide); *Miller v. Alabama*, 567 U.S. 460, 479 (2012) (extending the *Graham* rule to prohibit mandatory life sentences without parole for any crime committed while the offender was a juvenile); *Montgomery v. Louisiana*, 577 U.S. 190, 208–09 (2016) (holding that state courts must give these rules retroactive effect on collateral review). Therefore, he argued, "he was not serving a legal term of life imprisonment" when he stabbed Jones and could not be convicted of § 1118 murder based on an unconstitutional life sentence. Mot. to Dismiss, R.112, PageID 481.

At that time, Thompson had already filed a motion in the Superior Court of the District of Columbia to vacate his sentence on Eighth Amendment grounds. He also claimed that the government withheld exculpatory evidence and knowingly failed to correct false testimony, and that his counsel was constitutionally ineffective. The government agreed that his "very lengthy sentence is impermissible under the Eighth Amendment." Mot. Dismiss Count Two Exs., R. 112-4, PageID 530. The D.C. judge that sentenced Thompson also agreed that his sentence is "excessive and unconstitutional" and that he is entitled to a resentencing hearing if his collateral attacks on the conviction are unsuccessful. Mot. Dismiss Count Two Exs., R. 112-2, PageID 493. But those claims are still unresolved, and he has yet to be resentenced.

In the district court's view, the pending resentencing in the D.C. courts had no bearing on the § 1118 charge. While it acknowledged that "his predicate D.C. conviction may be vulnerable (at least in part) to collateral attack," it held that "Defendant does not establish a right to challenge the conviction here." Op. and Order, R. 151, PageID 719. The court observed that, in other contexts, "courts have refused collateral attacks against predicate convictions." *Id.* at PageID 725. The district court further emphasized that "[t]he § 1118 text itself includes no requirement that the underlying life sentence be valid, constitutional, or immune to collateral challenges." *Id.* at PageID 723. So regardless of whether Thompson is resentenced, he was serving a life sentence at the time of the murder, and that was sufficient to deny Thompson's motion.

The case proceeded to trial, and Thompson sought to introduce evidence that medical personnel and prison staff caused or contributed to Jones's death by unreasonably delaying medical care and providing grossly negligent care. His theory was that he could not be convicted of murder because the medical negligence was a superseding cause of Jones's death. Thompson specifically sought to introduce the testimony of two medical experts, Dr. Andrew Bernard and Dr. Barry Walling, and a former Bureau of Prisons warden, Cameron Lindsay. Dr. Bernard opined that Jones's only chance to survive his stab wounds was through surgery; medical personnel took an extraordinarily long time to move Jones to a trauma center and erred by sedating him; and Jones likely would have survived if rapidly moved to a trauma center for surgery. Dr. Walling likewise opined that the medical response was negligent in various ways,

including unreasonable delay and the use of a sedative, and that Jones likely would have survived if immediately transferred to a trauma center even though the stab wounds were fatal without treatment. Warden Lindsay likewise opined that there was unnecessary delay in treating the victim and that the victim received inadequate medical care.

The government moved to exclude the evidence, and the district court granted the motion. It acknowledged that defendants are constitutionally entitled to present a full defense. But it did not believe that this evidence was "relevant" to Thompson's criminal liability. Order, R.421, PageID 1967. As to Drs. Bernard and Walling, the district court reasoned that both acknowledged the wounds were fatal on their own and that Jones's death did not "occur[ ] independently of the stabbing or solely from the medical care." *Id.* Accordingly, the evidence could not absolve Thompson of Jones's murder. The district court excluded the pertinent portion of Warden Lindsay's testimony for similar reasons.

The government also offered its own expert testimony. Dr. Darinka Mileusnic-Polchan, the chief medical examiner for Knox County, Tennessee, testified about the cause of Jones's death. Dr. Mileusnic-Polchan did not author the autopsy report herself, but her testimony was based on her review of the report and the underlying photographs. Thompson did not object to Dr. Mileusnic-Polchan's testimony at trial. But after he filed this appeal, the Supreme Court decided *Smith v. Arizona*, which, as we discuss later, is relevant to Dr. Mileusnic-Polchan's testimony. *See* 144 S. Ct. 1785 (2024).

The jury found Thompson guilty on all three counts.[1] The district court sentenced Thompson to concurrent prison terms of life for the two murder convictions and 60 months for possessing a prohibited object. Thompson now appeals his conviction and sentence.

**ANALYSIS**

Thompson raises three issues on appeal. First, he argues that the district court wrongly excluded evidence that medical personnel and prison staff contributed to Jones's death. Second, he argues that the district court should have dismissed the murder charge under § 1118 because

---

[1]Thompson was convicted of second-degree murder, a lesser-included offense under 18 U.S.C. § 1111.

his underlying life sentence is unconstitutional.  Third, he filed a supplemental brief arguing that the medical examiner's testimony violated the Confrontation Clause, as interpreted in the Supreme Court's recent *Smith v. Arizona* decision.  *See* 144 S. Ct. at 1791.  We disagree on all three and affirm.

## I.       Expert Testimony

Thompson first challenges the district court's exclusion of expert testimony that medical personnel and prison staff contributed to Jones's death.  Drs. Bernard and Walling agreed that Jones's stab wounds would have killed him without medical intervention.  Both doctors nevertheless opined that Jones "likely would have survived" (in Dr. Bernard's words) or had a "very reasonable chance" of survival (in Dr. Walling's words) if medical staff at the prison had quickly taken him to a trauma center.  Bernard Rep., R.271-5, PageID 1304; Walling Rep., R.271-5, PageID 1307.  They also agreed that the staff behaved incompetently.  Among other things, the staff took an "extraordinarily long" time to transport Jones.  Bernard Rep., R.271-5, PageID 1304; *see* Walling Rep., R.271-5, PageID 1307.  And they wrongly decided to sedate him, which hastened "his imminent death."  Bernard Rep., R.271-5, PageID 1304; *see* Walling Rep., R.271-5, PageID 1308.  Warden Lindsay similarly opined that there was a "totally unacceptable" delay in treating Jones and that he did not receive "adequate medical care." Lindsay Rep., R.271-6, PageID 1311–12.

The district court excluded this opinion testimony.  It "could find no example" of any court permitting a defendant to avoid a murder conviction on the theory that "better, faster, or different medical care for an intentionally inflicted and likely mortal wound might have averted death."  Order, R.421, PageID 1959.  It thus held that these three expert opinions were "not relevant" to Thompson's murder charges.  *Id.* at PageID 1965.  We review a district court's exclusion of evidence for an abuse of discretion.  *United States v. Randolph*, 794 F.3d 602, 613 (6th Cir. 2015).  Under that test, we review legal conclusions de novo and factual findings for clear error.  *See id.*

It is not clear whether Thompson seeks to raise a constitutional challenge or an evidentiary challenge to the exclusion of his expert evidence.  But the difference does not matter

here. Although a defendant has a constitutional right to put on a complete defense, the Supreme Court has held that a district court may generally exclude evidence under one of the "well-established rules of evidence" without constitutional difficulties. *United States v. Reynolds*, 86 F.4th 332, 351 (6th Cir. 2023) (quoting *Holmes v. South Carolina*, 547 U.S. 319, 326 (2006)). And in this case, the district court relied on the well-established relevancy test to exclude Thompson's proffered evidence. *See id.* That test renders evidence relevant only if "it has any tendency to make a fact" that "is of consequence in determining the action" "more or less probable than [the fact] would be without the evidence[.]" Fed. R. Evid. 401.

We thus must ask whether the "fact" that Thompson's experts sought to establish (that Jones might have survived with proper care) is "of consequence" to the murder charges against him. *Id.* The answer to that question depends less on the meaning of Rule 401's relevancy test and more on the meaning of the two murder statutes at issue here: 18 U.S.C. §§ 1111 and 1118. The first of these statutes (which dates to the codification of Title 18 in 1948) defines murder as "the unlawful killing of a human being with malice aforethought." 18 U.S.C. § 1111(a). The statute then distinguishes first-degree murder from second-degree murder based on the presence of certain aggravating factors that do not matter in this case. *Id.* The second of the statutes (which dates to a 1994 crime bill) bars "the murder of another" by a person "confined in a Federal correctional institution under a sentence for a term of life imprisonment[.]" *Id.* § 1118(a). It incorporates § 1111's murder definition. *Id.* § 1118(b). For both statutes, then, we must ask when (if ever) this statutory definition would permit a defendant who inflicts an otherwise mortal injury on a victim to assert as a defense that proper medical care could have saved the victim's life.

As with any statutory question, we begin with the text. *See Staples v. United States*, 511 U.S. 600, 605 (1994). The murder definition ("the unlawful killing of a human being with malice aforethought") does not define the critical word for present purposes: killing. 18 U.S.C. § 1111(a). That word typically means (somewhat circularly) an "act of one that kills." *Webster's Third New Int'l Dictionary* 1242 (1993); *see* 1 *Funk & Wagnalls New Standard Dictionary of the English Language* 1352 (1943). The verb to "kill," in turn, typically means "to deprive of life" or "cause the death of." *Webster's Third, supra*, at 1242; *see Funk & Wagnalls*,

*supra*, at 1351. So a killing is simply an action that causes a death. But what causal connection must exist between the action and the death for an ordinary person to call the action a "killing"?

The common law helps answer this question. The Supreme Court has long told us to interpret a term of art that Congress incorporates into a statute consistently with its common-law meaning. *See, e.g.*, *Neder v. United States*, 527 U.S. 1, 21–22 (1999); *Staples*, 511 U.S. at 605; *Morissette v. United States*, 342 U.S. 246, 263 (1952). And Congress's definition of murder matches the traditional common-law definition of that crime almost word for word. *See Schad v. Arizona*, 501 U.S. 624, 640 (1991) (plurality opinion); *id.* at 648 (Scalia, J. concurring in part and concurring in the judgment); 5 St. George Tucker, *Blackstone's Commentaries* 195 (1803).

To establish a causal connection between an action and a result, the common law at least required the action to be an "actual" or "but-for" cause of the result. *See Burrage v. United States*, 571 U.S. 204, 210–11 (2014). In other words, the prosecution needed to prove "that the harm [here, the death] would not have occurred" but for the defendant's action. *See id.* at 211 (citation omitted); 1 *Wharton's Criminal Law* § 6.1 (16th ed.), Westlaw (database updated Aug. 2024). Yet this "but-for" test would cover a great many actions with only a tenuous connection to a person's death. Suppose a defendant punches a victim with enough non-lethal force as to cause a modest injury and necessitate a trip to an emergency room. Suppose further that the victim dies from an accidental "fire" that breaks out at the hospital. *Brackett v. Peters*, 11 F.3d 78, 79 (7th Cir. 1993). Even though the defendant's actions were the but-for cause of the death (because the victim would not have been in the hospital at the time of the fire but for the defendant's strike), we doubt anyone would call the defendant a "killer" under these circumstances. *See id.*

How did the common law cut off liability for these types of tragic happenstances? It adopted an additional causation requirement: "legal" or "proximate" cause. *See Burrage*, 571 U.S. at 210; *Wharton's*, *supra*, § 6.1. This (somewhat nebulous) concept encompassed many different ideas that limited liability in different ways. *See, e.g.*, *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692–93 (2011); *Holmes v. Secs. Investor Prot. Corp.*, 503 U.S. 258, 268–69 (1992). Some cases have refused to treat a defendant's action as a proximate cause if the action had only an indirect connection to the harm. *See Holmes*, 503 U.S. at 268–69. Others refused to

treat the action as the proximate cause if the harm was not the action's foreseeable result. *See County of Los Angeles v. Mendez*, 581 U.S. 420, 431 (2017). And still others refused to treat the action as the proximate cause if an intervening or superseding cause sat in between the action and the ultimate harm. *See Exxon Co., U.S.A. v. Sofec, Inc.*, 517 U.S. 830, 837–38 (1996); 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.4(f)(3) (3d ed.), Westlaw (database updated Oct. 2023); *cf. United States v. Martinez*, 588 F.3d 301, 319 (6th Cir. 2009).

To resolve Thompson's appeal, we may assume that § 1111(a)'s murder definition incorporates both but-for causation and proximate causation. *Cf. United States v. Swallow*, 109 F.3d 656, 659 (10th Cir. 1997). Yet Thompson does not argue that his medical experts say anything relevant to but-for causation. Whether or not the medical personnel acted appropriately, Jones's death "would not have occurred" "but for" Thompson's violent conduct. *Burrage*, 571 U.S. at 211 (citation omitted). Thompson's expert evidence instead concerns proximate causation. Thompson effectively suggests that the medical staff's incompetence in treating Jones qualifies as an "intervening" cause of Jones's death that could relieve him of liability. Appellant Br. 23.

A "well established rule of the common law" rebuts this causation defense. *Commonwealth v. Hackett*, 2 Allen 136, 141 (Mass. 1861). The "uniform" body of law held that defendants who injured victims with "dangerous wound[s]" committed murder if the victims died—even if improper medical care "aggravated" the victims' injuries or if they might have survived with proper care. *Id.* at 140–42; *see also, e.g., Hopkins v. United States*, 4 App. D.C. 430, 438–41 (D.C. Cir. 1894); *State v. Bantley*, 44 Conn. 537, 538–40 (1877); *State v. Morphy*, 33 Iowa 270, 276–77 (1872); William O. Russell & Charles S. Greaves, *A Treatise on Crimes and Misdemeanors* 504–05 (7th Am. ed. 1853). Many authorities date this principle to the time of Matthew Hale. *See Hopkins*, 4 App. D.C. at 439–40. He distinguished potentially mortal from nonmortal injuries as the dividing line for murder: If a defendant landed a blow that "may be" "mortal" but might "be cured" "with good care," the defendant committed a murder if the victim died. 1 Matthew Hale, *History of the Pleas of the Crown* 428 (1736). If, by contrast, "the wound or hurt be not mortal" and the victim died because of the "medicine" that a doctor provided, the defendant did not commit a murder. *Id.*; *see also, Bantley*, 44 Conn. at 538.

Under this dichotomy, an evidentiary treatise suggested that "the medicines administered to" the victim must qualify as the "sole cause" of death such that the "wound itself" did not contribute to the victim's demise. 3 Simon Greenleaf, *A Treatise on the Law of Evidence* § 139, at 122 (13th ed. 1876).

Overwhelming modern caselaw has followed the same approach. These cases adopt two requirements for a medical provider's improper care to break the causal chain between a defendant's violence and a victim's death. *See United States v. Rodriguez*, 766 F.3d 970, 984 (9th Cir. 2014); Carolyn Kelly MacWilliam, Annotation, *Homicide: Liability Where Death Immediately Results from Treatment or Mistreatment of Injury Inflicted by Defendant*, 50 A.L.R.5th 467 § 7 (1997). The cases first require proof that the provider committed "extraordinary" or "gross" "medical negligence." *Rodriguez*, 766 F.3d at 984 (citing cases); LaFave, *supra*, § 6.4(f)(5). And, like the Greenleaf treatise, the cases next require proof that the provider's negligence qualified as the "sole cause of the victim's death." *United States v. Rodriguez*, 279 F.3d 947, 951–52 (11th Cir. 2002) (citation omitted).

Because § 1111 adopts the common-law definition of murder, we likewise interpret this statute to incorporate this common-law causation principle. *See Neder*, 527 U.S. at 21–22. That said, we see some ambiguity over what this principle precisely required. For example, what do the cases mean when they say that the medical misconduct must have been the "sole cause" of the victim's death? *Rodriguez*, 279 F.3d at 951–52 (citation omitted); Greenleaf, *supra*, § 139, at 122. Presumably the defendant's violence will always qualify as an additional but-for cause in this factual situation because the medical personnel would not have had the chance to provide the fatal care but for this violence. And presumably the test requires more than proof that the defendant's violence was a but-for cause of the victim's death (as in our hospital-fire example).

But we need not resolve this ambiguity to decide this case. Whatever the precise meaning of "sole cause," Thompson's own experts show that the medical care here could not fit any definition of that phrase. To the contrary, Drs. Bernard and Walling both opined that Thompson inflicted fatal stab wounds on Jones and that Jones would have died from those dangerous wounds without immediate emergency surgery. Because Thompson's experts suggested that Jones's stab wounds were themselves the primary cause of Jones's death,

the allegedly improper medical care did not break the causal chain. And the opinions about that improper care did not convey anything "of consequence in determining" whether Thompson committed murder. Fed. R. Evid. 401. The district court thus did not abuse its discretion by excluding Thompson's proposed evidence.[2]

## II.        Life Sentence and § 1118 Conviction

Thompson next argues that the district court should have dismissed the § 1118 charge because his underlying life sentence is unconstitutional. We review de novo the district court's denial of a motion to dismiss an indictment on legal grounds. *United States v. Rankin*, 929 F.3d 399, 404 (6th Cir. 2019).

Section 1118 provides that "[a] person who, while confined in a Federal correctional institution under a sentence for a term of life imprisonment, commits the murder of another shall be punished by death or by life imprisonment." 18 U.S.C. § 1118(a). For this statute, a "term of life imprisonment" includes "an indeterminate term of a minimum of at least fifteen years and a maximum of life." *Id.* § 1118(b). Thompson claims that his underlying sentence of 127 years to life—a functional life sentence for a nonhomicide crime he committed as a juvenile—contravenes *Graham v. Florida* and its progeny. *See* 560 U.S. at 82. The district court, however, reasoned that the constitutionality of the underlying sentence is irrelevant because § 1118's text "includes no requirement that the underlying life sentence be valid, constitutional, or immune to collateral challenges." Op. and Order, R. 151, PageID 724. We decline to adopt the district court's reasoning in this respect, and instead reserve the statutory question for if and when it is properly presented. We agree with the district court, however, that this direct appeal of a subsequent conviction is not the appropriate vehicle for Thompson to collaterally attack his D.C. sentence. Instead, if Thompson is ultimately resentenced to less than a qualifying life sentence by the D.C. courts, he may challenge his § 1118 conviction under 28 U.S.C § 2255.

---

[2]Our holding today is limited in two key respects. First, it is limited to situations where the defendant inflicted a fatal wound. If the wound was not fatal, the causation question becomes more complicated, and causation evidence would be relevant to finding the answer. Second, our holding is limited only to criminal cases under the two relevant murder statutes. We do not purport to make any alterations to the regime of civil liability for medical negligence.

This is the path suggested by *Custis v. United States*, 511 U.S. 485, 497 (1994). *Custis* asked whether the sentencing enhancement under 18 U.S.C. § 924(e)—which, like § 1118, prescribes a harsher punishment for recidivist offenders—could stand even if one or more of the predicate offenses is invalidated. *See id.* at 488. While the Court held that Custis could not collaterally attack his prior state convictions in his federal sentencing proceedings, it did not preclude a later challenge. *See id.* at 496–97.[3] Instead, it left open the possibility that Custis could challenge his state convictions via state or federal postconviction review and then apply to reopen "any federal sentence enhanced by the state sentences." *Id.* at 497. The Court did not express a view on the merits of that potential challenge. The First Circuit later interpreted *Custis* to allow a defendant to use a habeas petition to invalidate a sentencing enhancement by showing that their predicate convictions were overturned by a court of competent jurisdiction. *United States v. Pettiford*, 101 F.3d 199, 200–01 (1st Cir. 1996) (affirming the grant of habeas relief for a conviction under 18 U.S.C. § 924(e) when the predicate state convictions were later vacated by the state court).

We follow the same approach here. Now, on direct appeal, we do not decide the merits of Thompson's collateral attack on his predicate sentence. Thompson has already sought to vacate his prior sentence in the D.C. courts. If his challenge is successful and he is resentenced to less than a qualifying term of life imprisonment under § 1118, he can then attempt to challenge the propriety of his conviction under § 1118 on federal postconviction review.[4]

---

[3]The *Custis* Court "decline[d]" to "extend the right to attack collaterally prior convictions used for sentence enhancement beyond the right to have appointed counsel established in *Gideon*." 511 U.S. at 496. It viewed the denial of this right as "a unique constitutional defect." *Id.* We express no opinion on whether *Custis*'s limitation of collateral attacks to *Gideon* challenges extends to when a defendant collaterally attacks a state sentence, rather than a conviction. That question remains disputed. *See United States v. Salamanca*, 821 F. App'x 584, 589 (6th Cir. 2020) (Stranch, J., dissenting). Instead, we follow *Custis* as the appropriate approach for reserving a challenge that is not yet properly presented in light of ongoing resentencing proceedings.

[4]Thompson's § 2255 challenge might not raise any statute of limitations issues, even if the resentencing takes longer than one year from when Thompson's conviction becomes final. *See* 28 U.S.C § 2255(f)(1). The date on which Thompson is resentenced in the D.C. courts might qualify as "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." *Id.* § 2255(f)(4). And Thompson may also argue that the new fact—that he was resentenced to less than a qualifying life sentence—could not have been "discovered" before then. Under this view, he would have one year from that date to file a § 2255 petition. *Cf. Linscott v. Rose*, 436 F.3d 587, 591 (6th Cir. 2006) (holding, in the § 2254 context, that resentencing alters finality and citing an Eleventh Circuit opinion stating that, "AEDPA cannot be interpreted to require a prisoner to raise claims before they arise" (quoting *Hepburn v. Moore*, 215 F.3d 1208, 1209 (11th Cir. 2000))). But it is premature to resolve this question now.

But we "express no opinion on the appropriate disposition of such" a challenge. *Custis*, 511 U.S. at 497.

## III.    Confrontation Clause

Lastly, Thompson argues that the district court plainly erred in permitting the medical examiner, Dr. Mileusnic-Polchan, to testify about an autopsy performed by an unavailable pathologist, contravening the Supreme Court's recent Confrontation Clause decision in *Smith v. Arizona*, 144 S. Ct. 1785 (2024). Because Thompson did not object to this testimony below, he asks for plain error review. *See United States v. Oliver*, 397 F.3d 369, 375 (6th Cir. 2005). The government contends that Thompson affirmatively waived this argument by disclaiming it at trial and by not raising it in his opening brief. But we need not decide whether Thompson waived this argument because it fails even on plain error review. *Cf. United States v. O'Lear*, 90 F.4th 519, 533 (6th Cir. 2024). Thompson cannot demonstrate there was "(1) error, (2) that 'was obvious or clear,' (3) that 'affected defendant's substantial rights' and (4) that 'affected the fairness, integrity, or public reputation of the judicial proceedings.'" *United States v. Vonner*, 516 F.3d 382, 386 (6th Cir. 2008) (en banc) (citation omitted).

*Smith* involved similar facts to Thompson's case: a "substitute" analyst testified about his own conclusions on drug testing after reviewing the report that another analyst had prepared. *See* 144 S. Ct. at 1795. Prior to *Smith*, the Court held that the Confrontation Clause protects a defendant's right to cross-examine the author of a forensic report—prepared in anticipation of prosecution—that the government offers to prove the defendant's guilt. *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009); *Bullcoming v. New Mexico*, 564 U.S. 647 (2011). If the author is unavailable and not subjected to prior cross-examination, a court cannot admit the report. *See Bullcoming*, 564 U.S. at 652. In *Smith*, the Court reasoned that the Clause's protections apply when a substitute analyst offers "independent" conclusions while conveying the substance of the underlying report. *Smith*, 144 S. Ct. at 1800. Accordingly, the government must make the authoring analyst available for cross-examination to admit its substance. *See id.* at 1802. In supplemental briefing, Thompson now argues that admitting Dr. Mileusnic-Polchan's testimony violated the Confrontation Clause, as interpreted in *Smith*. As he sees it, Dr. Mileusnic-Polchan conveyed the substance of the underlying autopsy report during her

testimony, but Thompson did not have the opportunity to cross-examine the report's author, so the testimony should have been excluded.

Whether Dr. Mileusnic-Polchan's testimony ran afoul of *Smith*—in other words, whether there was "error" or whether that error was "plain"—is a close call. But we need not decide that question because even if there were error, it did not affect Thompson's substantial rights. For an error to affect a defendant's substantial rights, it "must have 'substantial and injurious effect or influence in determining the . . . verdict.'" *United States v. Tuttle*, 837 F. App'x 391, 395 (6th Cir. 2020) (alterations in original) (quoting *United States v. Dominguez Benitez*, 542 U.S. 74, 81 (2004)). In *Tuttle*, we held that erroneously admitted testimony did not substantially affect the defendant's rights in part because the government told the jury not to focus on that testimony during closing arguments. *See id.* Here, Thompson asked the jury to acquit on theories of self-defense and diminished capacity, which, by their terms, accept causation and provide an excuse or justification. Additionally, the jury saw both the photographs of the seventeen stab wounds and video evidence of the murder, and Dr. Mileusnic-Polchan's testimony about the wounds was unlikely to have substantially affected its conclusion on causation. *See United States v. McGee*, 529 F.3d 691, 698–99 (6th Cir. 2008) (holding that the "constitutional error was harmless beyond a reasonable doubt" where the government introduced evidence "independent of" the erroneously admitted testimony to establish guilt). Accordingly, Dr. Mileusnic-Polchan's testimony, even if erroneously admitted, cannot be said to have affected Thompson's substantial rights.

## CONCLUSION

We affirm Thompson's conviction and sentence.