RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0005p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

No. 24-5544

RONNIE LEE GOLDY,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the Eastern District of Kentucky at Lexington.
No. 5:23-cr-00089-1—Danny C. Reeves, District Judge.

Argued: October 22, 2025

Decided and Filed: January 8, 2026

Before: SUTTON, Chief Judge; BATCHELDER and LARSEN, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Kaycee L. Berente, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Andrew T. Boone, UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee. **ON BRIEF:** Kaycee L. Berente, Kevin M. Schad, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Columbus, Ohio, for Appellant. Andrew T. Boone, Charles P. Wisdom, Jr., UNITED STATES ATTORNEY'S OFFICE, Lexington, Kentucky, for Appellee.

———————————

## OPINION

———————————

ALICE M. BATCHELDER, Circuit Judge. In this case, a jury convicted a former county prosecutor on charges of Honest Services Wire Fraud, 18 U.S.C. §§ 1343 &1346, violations of

the Travel Act, 18 U.S.C. § 1952(a)(3), and Federal Program Bribery, 18 U.S.C. § 666(a)(1)(B). On appeal, the former prosecutor challenges both his conviction and sentence. We affirm.

## I.

Ronnie Lee Goldy was the elected Commonwealth Attorney for Kentucky's 21st Judicial Circuit, meaning he was the county prosecutor for four counties. M.H. was a young adult woman who kept getting arrested. They agreed that she would trade sex acts and nude photos and videos for his help with her legal problems, e.g., reduction of charges, withdrawal of warrants, and release from jail. When the FBI discovered this arrangement, a federal prosecutor charged Goldy with several federal offenses and tried his case to a jury. At trial, the prosecutor produced incriminating text messages between Goldy and M.H., M.H.'s testimony, and testimony from law enforcement investigators and experts. Goldy testified in his defense and asserted, in part, that he never solicited pictures or videos from M.H. but that she was helping him to investigate other criminals. Text messages and testimony proved that was untrue. The jury convicted Goldy on all counts. The presentence report (PSR) calculated the advisory range at 33 to 41 months in prison and the court sentenced Goldy to 41 months. Its special conditions of supervised release included that Goldy must refrain from excessive use of alcohol during supervised release.

## II.

Goldy's first claim on appeal is that the district court erred at trial by limiting or excluding some of his testimony. Goldy had been a county prosecutor and he wanted to testify about Kentucky law, specifically that nothing he did for M.H. was an "official act" under Kentucky law or as would be relevant to his federal charges, because—according to Goldy—M.H. was not properly within the court's jurisdiction in the cases in which the prosecution said he had helped her. Goldy claims that by prohibiting this testimony, the district court abused its discretion and violated his constitutional right to present a defense.

During his testimony, Goldy's lawyer asked him to explain, based on his experience as a county prosecutor, how the Kentucky criminal-court system works, e.g., what do the case numbers mean, what happens when a misdemeanor case becomes a felony case, what are fixed

versus indeterminate sentences, and do misdemeanor sentences run concurrently with felony sentences. At that point, the district court expressed concern that Goldy was testifying as an expert on Kentucky law, but defense counsel had not identified him (or anyone else) as an expert witness. At a sidebar, the prosecutor objected to the expert testimony (i.e., to Goldy's explaining the law to the jury), and defense counsel asked to introduce the testimony by avowal, outside the presence of the jury. The court permitted the testimony to continue by avowal.

Defense counsel continued to question Goldy about the Kentucky criminal justice system, e.g., when does probation expire, what happens if probation is not extended, and after a person is discharged from probation, would anything involving that person be an "official proceeding." After a brief discussion of warrants, defense counsel asked the district court to hold that testimony admissible, and the court answered:

> You may ask him if warrants were served. But in terms of asking him expert opinions, he's not been qualified, and some of his opinions are contrary to law, so [I] would not allow him to express those opinions at this point.

After a brief exchange with the prosecutor, the court continued:

> Well, [I am] mak[ing] a finding that those proceedings that occurred after that date that [defense counsel] is hung up on were official proceedings. . . . So you asking him to state that they were not official proceedings is contrary to [my] findings. I'll make the ultimate decisions as to the issues of law in the case[.] . . . Now, if you want to stick to the facts of the case, you can do that. When you expand beyond that and talk about everything in general, I'm not going to let you do that.

As the court recognized, and defense counsel agreed, the point of the testimony was for Goldy to assert that under Kentucky law and the ordinary operation of Kentucky's criminal justice system, if M.H. were not properly on probation (or, put another way, she was on probation but if it were legally improper), then none of Goldy's actions on her behalf—with the police, other prosecutors, or courts—were "official proceedings" as a matter of Kentucky law.

The prosecutor argued that the jury question was whether Goldy engaged in certain acts (during "official proceedings") and the court agreed, adding that "there has been sufficient evidence for the jury to draw that conclusion." The court ended the avowal testimony and

recalled the jury.  Goldy continued to testify and offered opinions about the Kentucky criminal justice system and M.H.'s cases, but questioning did not return to "official proceedings."

When it came time for the court to instruct the jury on reaching its verdict, the court included in its instructions the following:

> Bribery and kickbacks involve the exchange of a thing or things of value for an official act by a public official. . . .
>
> To qualify as an official act, the public official must have made a decision or taken an action or agreed to make a decision or take an action on a question, matter, cause, suit, proceeding, or controversy.  Further, the question, matter, cause, suit, proceeding, or controversy must involve the formal exercise of governmental power.  It must be similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee.  It must also be something specific which requires particular attention by a public official.

In his closing argument, defense counsel argued that the prosecution had not proven that M.H. was properly on probation and, therefore, had not proven an "official proceeding":

> Now, the government has to prove that [M.H. was on probation].  They didn't have any testimony from any person from the Commonwealth of Kentucky to explain to you what the law is in regards to when [probation] begins, when it ends.
>
> I had Judge Lane to do it, and he readily agreed [with] the *Tapp* case -- in fact, that came from his own circuit, the Rowan Circuit Court.  He definitely stated, that's it, you can't extend [probation] unless it's made in writing and facts.  So he didn't extend it, he just extended supervision.  That is not extending probation as he said.
>
> Now, what does that mean?  Does that mean that there was an official proceeding? That's up to you-all.  You-all have to make that finding.

The jury convicted Goldy as charged, so it must have found that Goldy's efforts on M.H.'s behalf were official acts, whether or not she was properly on probation.

To convict Goldy on the honest services wire fraud charges, 18 U.S.C. §§ 1346 and 1343, the prosecutor had to prove that Goldy fraudulently deprived the public of the right to honest services through bribery or kickbacks.  *Skilling v. United States*, 561 U.S. 358, 404 (2010).  And as stated in the court's above-quoted jury instructions, an official commits bribery or offers kickbacks by agreeing to commit an "official act" in exchange for something of value.

*See McDonnell v. United States*, 579 U.S. 550, 563 (2016) (quotation marks omitted). The "official act" requirement also extends to federal program bribery under 18 U.S.C. § 666(a)(1)(B). *See Snyder v. United States*, 603 U.S. 1, 10-11 (2024). For both honest services wire fraud and federal program bribery, the Supreme Court has looked to 18 U.S.C. § 201(a)(3) to define the contours of an official act. *See McDonnell*, 579 U.S. at 562; *Snyder*, 603 U.S. at 10-11. Section § 201(a)(3) defines "an 'official act' as any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit." *McDonnell*, 579 U.S. at 566 (quoting 18 U.S.C. § 201(a)(3)) (quotation marks omitted). That is, an "official act" requires two things: (1) a matter that is or may be brought before a public official for decision, and (2) that the defendant agreed to take (or took) action on that matter so as to affect that decision. *Id*. at 567. "[S]etting up a meeting, calling another public official, or hosting an event does not, standing alone, qualify as an 'official act.'" *Id*. But a defendant may commit an "official act" "by using his official position to exert pressure on *another* official to perform an 'official act,'" or by "us[ing] his official position to provide advice to another official, knowing or intending that such advice will form the basis for an 'official act' by another official." *Id*. at 572. "It is up to the jury, under the facts of the case, to determine whether the public official agreed to perform an 'official act' at the time of the alleged *quid pro quo*." *Id*. at 572-73.

The prosecution overwhelmingly proved that Goldy engaged in official acts here. Based on the evidence at trial, M.H. and Goldy agreed that she would provide sex acts and sexually explicit depictions of herself in exchange for his help with her legal problems, e.g., getting her released from jail, reducing her bond, having a court hearing delayed and dismissed, having charges reduced, and helping her recover her car from impound. Goldy's theory is that these were not "official acts" because, in his view of Kentucky law, they were not taken in respect to "official proceedings" because after M.H.'s probation was up, she was discharged from it and no longer under the valid jurisdiction of the court. But the definition of "official acts," as elucidated above, is not nearly so strict, and it certainly encompasses Goldy's acts here. The above-cited definition does not even mention "official proceedings." Perhaps more importantly, however, it is not for the jury (or Goldy) to determine what is an "official act." That is a legal question for

the court to decide.  It was for the jury to determine *whether* Goldy agreed to perform the "official act" (as defined by the court) at the time of the alleged *quid pro quo*.

The court permitted Goldy to introduce evidence about whether M.H. had been discharged from probation at the time of the alleged *quid pro quo*, and evidence about any other factual aspect of the case.  The court did not permit him to opine as an expert about Kentucky law or the Kentucky criminal justice system, or to tell the jury how the law defined an "official act" or an "official proceeding" and what that meant.  But Goldy would have us believe otherwise.

The Constitution guarantees that a criminal defendant will have "a meaningful opportunity to present a complete defense."  *Crane v. Kentucky*, 476 U.S. 683, 690 (1986) (quotation marks and citation omitted).  Goldy contends that the district court's "wholesale exclusion of his testimony on an element of the wire fraud offenses" (presumably, he means the federal program bribery offense too) deprived him of a meaningful opportunity to present a complete defense.  Apt. Br. at 14-15.  He contends that the district court prevented him from "introduc[ing] eviden[ce] that [M.H.] was not subject to proper jurisdiction of the Kentucky court in the cases identified in the Indictment."  Apt. Br. at 14.  But the record proves this claim untrue.  In fact, the portion of defense counsel's closing argument that is quoted above proves this contention untrue.  Goldy also contends that "[t]he court did not allow Mr. Goldy to challenge whether he had performed or agreed to perform 'official acts' pursuant to 'official proceedings,'" and "the court refuse[d] to allow Mr. Goldy to present testimony that challenged the government's evidence as to whether Mr. Goldy performed or agreed to perform 'official acts.'"  Apt. Br. at 13, 12.  But again, the record proves this to be untrue.

And Goldy expands on his accusations in his reply brief.  There, he contends that the court "prevented [him] from providing testimony to refute the government's claim that he performed 'official acts,' but [] also prevented [him] from refuting the allegations that certain conduct was indeed part of a bribery scheme," and "prevented the jury from hearing evidence that provided context to the circumstances surrounding Mr. Goldy's conduct [and] also prevented the jury from hearing any evidence challenging the government's preferred view of the case."  Apt. Reply Br. at 2-3.  Again, the record proves these contentions to be untrue.  To be

very clear, and to repeat, the district court prohibited Goldy from opining as an expert about his interpretation of Kentucky law and the Kentucky judicial process, but it allowed all his other testimony and witnesses.

In summary, we reject Goldy's exclusion-of-testimony argument in any of its formulations.  That is, to the extent that Goldy argues that the question of how the law defines an "official act" is somehow a fact question for the jury, rather than a legal question for the court, the argument fails.  To the extent that Goldy argues that he had a right to testify as a lay witness about the meaning and effect of Kentucky law and the ordinary operation of the Kentucky judicial process, that argument fails as well.  And to the extent that Goldy's arguments rest on false accusations disproven by the record, those arguments are baseless, and we reject them as such.

### III.

Goldy's next claim is that the prosecutor did not produce sufficient evidence to justify the jury's guilty verdict on (1) the interstate aspect of the charges, (2) the federal aspect of the bribery charges, or (3) the substantive aspect of the bribery charges, i.e., the *quid pro quo*.

The government argues that Goldy waived these sufficiency-of-the-evidence claims because he did not include them in the Rule 29 motions he argued at trial.  *See United States v. Osborne*, 886 F.3d 604, 618 (6th Cir. 2018) ("Although specificity is not required in a Rule 29 motion, when a defendant makes a motion on specific grounds all grounds not specified in the motion are waived." (quotation marks, editorial marks, and citations omitted)).  While it is true that Goldy did not include these specific grounds in his Rule 29 motion, at trial the district court raised the issues on its own and discussed them with the prosecution during its consideration of Goldy's Rule 29 motions.  So, it is not entirely clear that Goldy waived these arguments or would not have raised them had the court not done so.  *See United States v. Mercer-Kinser*, 149 F.4th 870, 878 (6th Cir. 2025).

On a sufficiency-of-the-evidence claim, the appeals court asks "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Maya*,

966 F.3d 493, 498 (6th Cir. 2020) (quotation marks and citation omitted). This "essentially addresses whether the government's case was so lacking that it should not have even been submitted to the jury." *Musacchio v. United States*, 577 U.S. 237, 243 (2016) (quotation marks and citations omitted); *id.* at 244 ("All that a defendant is entitled to on a sufficiency challenge is for the court to make a 'legal' determination whether the evidence was strong enough to reach a jury at all."). And "we are bound to make all reasonable inferences and credibility choices in support of the jury's verdict." *United States v. Steele*, 919 F.3d 965, 971 (6th Cir. 2019) (quotation marks and citation omitted).

**A.**

Goldy claims that the prosecutor did not prove the interstate aspect of the charges. To obtain convictions on Federal Wire Fraud and Travel Act charges, the prosecution must prove an interstate nexus, such as through a showing that the defendant transmitted an interstate wire communication in furtherance of the unlawful activity. 18 U.S.C. §§ 1343 & 1952(a)(3). Here, the prosecutor produced numerous electronic communications between Goldy and M.H. (some 230 screenshots worth of messages) that were conveyed on Facebook's and Apple's messaging programs. FBI Agent Chelsea Holliday testified that, due to the operation of those programs, the messages necessarily traveled interstate because the messages went out of state to a server and then came back in. That testimony was enough to support the jury's conclusion.

In fact, Goldy does not dispute that at least some of those messages traveled over the internet, and we have held that transmission over the internet is sufficient evidence on its own to show the interstate nexus. *See United States v. Napier*, 787 F.3d 333, 346–47 (6th Cir. 2015) ("The relevant inquiry is whether there is enough circumstantial evidence that these electronic communications were transmitted through interstate wires. Given the omnipresent nature of the Internet, this is not a difficult burden for the government to satisfy. . . . [The] use of the Internet, coupled with the . . . timestamps indicated on his emails, is sufficient to satisfy the federal jurisdictional nexus." (citations omitted)); *see also United States v. Drummond*, 255 F. App'x 60, 64 (6th Cir. 2007); *United States v. Shah*, 95 F.4th 328, 358 (5th Cir. 2024) ("This court's caselaw is clear that the use of the internet provides the interstate hook necessary for jurisdiction.").

**B.**

Goldy claims that the prosecutor did not prove the federal aspect of Federal Program Bribery, 18 U.S.C. § 666. To obtain a conviction under § 666, the prosecutor must prove as an element of the offense a nexus between the defendant's conduct and the federal government, i.e., that the defendant was the agent of an entity that received at least $10,000 in federal funding during the one-year period at issue. *Id.* Here, the prosecutor produced two relevant witnesses. FBI Agent Holliday testified that a grant from the Department of Health and Human Services (HHS) provided millions of dollars in federal funding to the Kentucky Attorney General's (AG's) office in 2018 "to further criminal investigations," and that the Kentucky AG's office was "the overseeing agency" to the Commonwealth Attorneys' (county prosecutors') offices. And Ashton McKenzie, who succeeded Goldy as the Commonwealth Attorney for the 21st Judicial Circuit (county prosecutor), testified that she was a state employee ("an Officer of the Commonwealth of Kentucky") and was "paid with state funds."

Despite this evidence, Goldy argues that he was not an agent of the Commonwealth of Kentucky, at least for purposes of § 666(b), but was an agent of only the 21st Judicial District or the counties in which his conduct occurred, and the federal prosecutor did not produce sufficient evidence to prove that *those counties* necessarily received $10,000 in federal funding in 2018. He also suggests that the federal funding from HHS was likely not for general criminal prosecution, so the prosecutor here did not prove a nexus between the federal funding and Goldy's bribery. To state it plainly, Goldy's point is that local bribery is not federal bribery under § 666, and therefore the prosecutor must prove the federal-funding nexus at a more granular level of specificity.

This is certainly a beguiling point and one that is not without supporters. *See*, *e.g.*, *Sabri v. United States*, 541 U.S. 600, 613 (2004) (Thomas, J., concurring in the judgment) (arguing, by example, that the Court's defense of § 666 "does not explain how there could be any federal interest in prosecuting a bribe paid to a city's meat inspector . . . just because the city's parks department had received a federal grant of $10,000" (quotation marks, editorial marks, and citation omitted)); *United States v. Suarez*, 263 F.3d 468, 488 (6th Cir. 2001) (Boggs, J., dissenting) ("The Supreme Court has rejected the blanket application of § 666 to all criminal

conduct by recipient organizations in *Fischer* and the weight of post-*Salinas* appellate authority has recognized the need for a connection.").  And Goldy relies on certain language from a case about an analogous § 666(b) issue:

> Our discussion [of 'benefits' under § 666(b)] should not be taken to suggest that federal funds disbursed under an assistance program will result in coverage of all recipient fraud under § 666(b).  Any receipt of federal funds can, at some level of generality, be characterized as a benefit.  The statute does not employ this broad, almost limitless use of the term ['benefit'].  Doing so would turn almost every act of fraud or bribery into a federal offense, upsetting the proper federal balance.

> To determine whether an organization participating in a federal assistance program receives 'benefits,' an examination must be undertaken of the program's structure, operation, and purpose.  The inquiry should examine the conditions under which the organization receives the federal payments.  The answer could depend, as it does here, on whether the recipient's own operations are one of the reasons for maintaining the program.

*Fischer v. United States*, 529 U.S. 667, 681 (2000) (paragraph break added).  Thus, Goldy contends that this passage from *Fischer* required the prosecutor to prove that the HHS grant was provided for general criminal prosecution and that the 21st Judicial District received at least $10,000 of that funding to be used for that purpose.  But this contention has at least two flaws.

First, this contention does not adhere to Sixth Circuit precedent, in which we distinguished *Fischer* as addressing only a limited question, and "reiterated" our prior holdings "that 18 U.S.C. § 666 does not require a nexus between the alleged bribes and the federal funding received by the recipient agency."  *Suarez*, 263 F.3d at 490 (quotation marks, editorial marks, and citations omitted)[1]; *see also United States v. Sullivan*, No. 3:17-cr-00012, 2018 WL 4924093, at *3 (E.D. Ky. Oct. 10, 2018) ("Having alleged that Longmeyer was a state agent at the time that Sullivan attempted to bribe him, pursuant to the statute's plain language, the government had to prove [only] that the state itself received the requisite federal funds, not any particular agency or program.").

And, perhaps more importantly, Goldy did not preserve this claim for appeal.  At trial, the district court instructed the jury that to convict Goldy on the federal bribery charges under

---

[1]In his Reply Brief, at p. 8, Goldy misleadingly cites the dissent in *Suarez* as if it were the holding.

§ 666, it must find that the prosecution proved four elements: (1) "that the defendant [Goldy] was an agent of the Commonwealth of Kentucky," (2) "that the Commonwealth of Kentucky was a state government that received, in [2018], benefits in excess [of] $10,000 under a federal program," (3) that Goldy agreed to the bribe during 2018, (4) and that the "transaction[] or series of transactions" were worth at least $5,000. Goldy accepted these instructions without objection.

In his opening brief in this appeal, Goldy framed this issue as insufficient evidence, claiming that the evidence did not prove he was the agent of an entity that received $10,000 in federal funding (i.e., the first two elements). But, based on the language of the jury instruction, the testimony by Ashton McKenzie and FBI Agent Holliday (that Commonwealth Attorneys are state employees and the state received millions in federal funding) was clearly sufficient to support the jury's finding that the prosecutor had proven the first two elements. Thus, in his reply brief, Goldy raised the prospect of plain error, and at oral argument he had to change tack to direct his dispute toward the jury instruction—but he conceded that the jury instruction was not challenged at trial and therefore not preserved for appeal, and the only review available was for plain error.

Ordinarily, "[t]o establish plain error, [a defendant] must show that the district court (1) committed an error, (2) that was clear or obvious, and (3) which affected [the defendant's] substantial rights. If [the defendant] meets this burden, then we may reverse the error if it affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Hoyle*, 148 F.4th 396, 402–03 (6th Cir. 2025) (quotation marks and citations omitted). But in the jury-instruction context, "our plain-error test requires a finding that, taken as a whole, the jury instructions were so clearly erroneous as to likely produce a grave miscarriage of justice." *United States v. Robinson*, 133 F.4th 712, 721 (6th Cir. 2025) (quotation marks and citation omitted). "And a defendant cannot show an 'obvious' error or 'clearly erroneous' instruction unless the claimed mistake is clear under current law." *Id.* at 722 (quotation marks and citation omitted).

Given Goldy's overall argument, his jury-instruction theory would be that a correct jury instruction for the first two (federal aspect) elements of the § 666 bribery offense would require the jury to find a direct nexus between the federal funding and both Goldy's misconduct and the

office of Commonwealth Attorney for the 21st Judicial District.  Far from being "clear under current law," that theory appears to be contrary to Sixth Circuit law, which "does not require a nexus between the alleged bribes and the federal funding." *Suarez*, 263 F.3d at 490 (quotation marks and citations omitted).  And, considering McKenzie's and Holliday's testimony at trial (that Goldy was a state agent at the time that M.H. was bribing him), the court reasonably concluded that the jury had to find only that the state, "not any particular agency or program," received the federal funding. *See Sullivan*, 2018 WL 4924093, at *3.  Moreover, given that the evidence of Goldy's guilt—as has been discussed and will be discussed further—was so overwhelming, Goldy has no basis to claim, much less show, a grave miscarriage of justice.  Based on all of this, the district court's jury instruction contained no plain error.

## C.

Goldy claims that the prosecutor did not prove bribery because he did not prove that Goldy's favors-for-sex agreement with M.H. involved a *quid pro quo*, because "[t]here was no 'meeting of the minds,' no 'specific, agreed-upon terms that could be reduced to writing.'"  Apt. Br. at 32.  In his brief, Goldy insists: (1) the photos "were unsolicited"; (2) the "'exchange' lacked any connection to [his] position as the Commonwealth Attorney"; (3) M.H. "admitted that their relationship was 'one-sided from [Goldy's] point of view,' indicating that Mr. Goldy was not receiving any 'gain' from [it]"; (4) M.H. did not provide "anything of value"; and (5) "there was no 'official act.'"  Apt. Br. at 32-33.  Goldy concludes that, "[t]he evidence put on at trial reveals a situation more akin to 'gifts' given on a couple instances *after* conduct had occurred."  Apt. Br. at 34.

As explained above, to convict Goldy on the federal program bribery charges and the honest services wire fraud charges, the prosecutor had to prove that Goldy agreed to commit an "official act" in exchange for something of value. *See McDonnell*, 579 U.S. at 563.  That is, there must have been "a *quid pro quo*—a specific intent to give or receive something of value *in exchange* for an official act." *United States v. Sun-Diamond Growers*, 526 U.S. 398, 404-05 (1999).  There is no honest claim that the evidence failed to prove this.  A reasonable juror could conclude that M.H. and Goldy agreed that she would trade sex acts and sexually explicit depictions of herself in exchange for his help with her legal problems.

Goldy's arguments—and his creative, alternative view of the evidence—ignore the crucial point that, at this stage, we consider the evidence in the light most favorable to the verdict, not Goldy, and ask only whether *any* rational trier of fact could have found a *quid pro quo*. *See Maya*, 966 F.3d at 498. This is not even close. The jury saw messages between Goldy and M.H. that spanned dozens of conversations. Any rational person, and likely *every* such person, could conclude from those messages that (1) Goldy's offers of help were in exchange for and in expectation of M.H.'s providing him sexual gratification (photos, videos, or actual sex), and (2) M.H.'s offers—sometimes willingly, but other times evasively or reluctantly—of that sexual gratification were in exchange for and contingent on Goldy's help with her never-ending legal troubles. Despite Goldy's attempts to persuade us that those text-message conversations mean something other than what they clearly say, no rational observer would conclude from them that M.H. was offering the nude photos and videos as gifts or gratuities.

Even if the text messages were not clear on their own, the prosecutor also called M.H. to testify about her relationship with Goldy and their exchange of messages. According to her testimony, Goldy thought that they were related (that she was his cousin), though she knew from the very beginning that they were not. And she testified that their relationship turned from friendly and joking, to sexual over the next year.

| | |
|---|---|
| Prosecutor: | Did you have sex with him? |
| M.H.: | Yes, sir. |
| Prosecutor: | About how many times? |
| M.H.: | I only had sex with him once, but I met with him multiple times. One of the times that I met him was, like, at the park. But it was usually the times that I had court. . . . |
| Prosecutor: | What did you do at the park? |
| M.H.: | We had sex. |
| Prosecutor: | Why did you send him images of yourself? |
| M.H.: | Because I needed help in court. |

She testified that Goldy could and did help her in court, and how:

> Prosecutor: Did you believe Mr. Goldy could help you with your criminal cases?
>
> M.H.: Yes, I knew he could.
>
> Prosecutor: How?
>
> M.H.: He presented himself as the man. But, like, he could basically do anything. . . .

Her testimony continued:

> Prosecutor: . . . My question is your expectation. How did you believe Mr. Goldy could help you in your criminal cases?
>
> M.H.: He could get things dismissed; he could talk to the judges for me; he could talk to Probation & Parole. He could not necessarily change the paperwork that come through, like revocation hearings and stuff, but he always -- everybody always asked him what he wants to do in any case.
>
> Prosecutor: And did he in fact help you in your criminal cases?
>
> M.H.: Every one of them.

She also discussed several text-message conversations.

> Prosecutor: What is the question [in this text message]?
>
> M.H.: 'What do I need to do to get that warrant taken care of?'
>
> Prosecutor: And then you follow it up with another message. What did you say there?
>
> M.H.: 'Beside the obvious, LOL.' Or laugh my ass off.
>
> Prosecutor: What did you mean by 'Besides the obvious'?
>
> M.H.: That it had come to the point that there was nothing more that needed to be done except sexual acts.
>
> Prosecutor: Would that include photos?
>
> M.H.: Yes, sir.
>
> Prosecutor: Videos?
>
> M.H.: Yes, sir.
>
> Prosecutor: How does Mr. Goldy respond?
>
> M.H.: 'Let me ask the judge tomorrow. I'll get everything lined up beforehand.'

The prosecutor produced another text-message conversation on the screen for the jury to see and asked M.H. about it.

| | |
|---|---|
| Prosecutor: | What is that message? |
| M.H.: | 'When do I get to see a video?' |
| Prosecutor: | What kind of video did you understand he was referencing? |
| M.H.: | A sexual video. |
| Prosecutor: | Let's go to the next page to see how you respond.  Ms. [M.H.], what was your response? |
| M.H.: | 'When am I not going to have a warrant?  Haha.' |
| Prosecutor: | And how does Mr. Goldy respond? |
| M.H.: | 'LOL.  Good point.  Incentive never hurt.' |
| Prosecutor: | What did you understand he meant there? |
| M.H.: | That I would never clap back like that, like asking for something.  Usually I'd just leave them unread.  But this time I was blunt about it and said when I don't have a warrant, I ain't giving you nothing without taking care of my warrant. |
| Prosecutor: | Did you feel like you owed him? |
| M.H.: | Yes. |
| Prosecutor: | What did you feel like you owed him? |
| M.H.: | Because -- that was just one example.  There's many times where he always says I owe him, I owe him.  He'd make sure I don't forget. |

There is no doubt that the evidence was sufficient to prove a *quid pro quo* in this case. Overwhelming evidence showed that M.H. and Goldy agreed that she would trade sex acts and sexually explicit depictions of herself in exchange for his help with her legal problems.

**IV.**

Goldy claims that M.H.'s sexually explicit photos and videos were "gratuities," not bribes, under the analysis in *Snyder v. United States*, 603 U.S. 1, 19 (2024) ("[A] state or local official does not violate § 666 if the official has taken the official act before any reward is agreed to. . . . [A] gratuity does not violate § 666."). Therefore, he contends that his convictions under 18 U.S.C. § 666 cannot stand.  But *Snyder* also rejects Goldy's argument:

The term 'rewarded' closes off certain defenses that otherwise might be raised in bribery cases. Consider a bribe where the agreement was made before the act but the payment was made after the act. An official might try to defend against the bribery charge by saying that the payment was received only after the official act and therefore could not have 'influenced' the act. By including the term 'rewarded,' Congress made clear that the timing of the agreement is the key, not the timing of the payment, and thereby precluded such a potential defense.

*Snyder*, 603 U.S. at 18-19. That means that Goldy's reliance on the timing—i.e., that he committed an "official act" to assist M.H. *before* receiving the sexual photos and videos—is not the golden ticket that he wants it to be. The prosecutor produced overwhelming evidence at trial of a long-standing *quid pro quo* between Goldy and M.H. For several years, Goldy did favors for M.H. in exchange for sexual depictions (and actual sex). Moreover, nothing in the record evidence supports Goldy's contention that M.H. sent these images as gifts or "gratuities."

## V.

Goldy challenges the supervised release condition that requires him to refrain from the excessive use of alcohol. Because he did not object at sentencing, our review is for plain error. *United States v. Prather*, 138 F.4th 963, 973 (6th Cir. 2025). Plain error means an error that was obvious or clear, affected his substantial rights, and affected the fairness, integrity, or public reputation of the proceedings. *United States v. Thompson*, 119 F.4th 445, 454 (6th Cir. 2024).

As Goldy asserts in his brief, "[t]he court's reasoning for the special condition was that it was 'necessary for proper rehabilitation and supervision of the defendant.'" Apt. Br. at 36. Goldy contends that it was unnecessary for the court to require him to refrain from excessive alcohol consumption because, as reported in the PSR, he rarely consumes alcohol anyway, has no mental health conditions, and presents a low risk of future substance abuse.

The government points out that this restriction is limited to *excessive* use, not just any use, and is limited to the three-year term of the supervised release. We have held that a restriction on *excessive* alcohol use is reasonably related to the goals of rehabilitation and protection of the public. *See United States v. Penaloza*, 648 F. App'x 508, 539-40 (6th Cir. 2016); *see also United States v. Inman*, 666 F.3d 1001, 1005 (6th Cir. 2012) ("[T]he pertinent statute on discretionary conditions does not permit a total ban on alcohol, but allows a court to

order the defendant to 'refrain from excessive use of alcohol.'   18 U.S.C. § 3563(b)(7)."
(emphasis omitted)).

But even if we were to give Goldy the benefit of the doubt and assume the court committed an error by ordering this special condition, and that the error was obvious or clear, Goldy has not even argued, much less proven, how this particular error would affect his substantial rights or affect the fairness, integrity, or public reputation of the proceedings.  If Goldy believes that he has a substantial right to the excessive use of alcohol, he has not made that argument.  Similarly, if he believes that an order banning a convicted felon from the excessive use of alcohol diminishes the fairness, integrity, or reputation of the district court, he has not made that argument either.

## VI.

Goldy claims the district court committed plain error when deciding his sentence by refusing to consider certain aspects of his personal circumstances, such as his disbarment and the associated loss of income.  Goldy contends that a sentencing court must consider, without limitation, any information concerning the convict's background, character, and conduct, as required by U.S.S.G. § 1B1.4, 18 U.S.C. § 3661, and *Concepcion v. United States*, 597 U.S. 481, 494 (2022).

Whether or not that is a correct reading of the law, it does not help Goldy in this plain error review.  As Goldy asserts in his brief: "The court noted Mr. Goldy's disbarment and his loss of income as specific factors it would not consider. . . . In reaching this determination, the district court pointed to *United States v. Bistline*, 665 F.3d 758, 765 (6th Cir. 2012) and *United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014)."  Apt. Br. at 39-40.  In *Bristline* and *Musgrave*, the defendants had suffered certain "collateral consequences" from their convictions, such as sex-offender registration and publication, personal financial loss, and the loss of a CPA license.  We held that the sentencing court cannot consider such "collateral consequences" as a reason to reduce the seriousness of the offense or reduce the sentence.

That is, even by Goldy's account, the district court followed Sixth Circuit precedent. Therefore, even if the court did err, such an error could not be obvious and clear.  Goldy appears

to disagree with *Bristline* and *Musgrave*, or believes they were wrongly decided, but they are nonetheless valid Circuit precedent, and the district court did not plainly err by following them.

**VII.**

For the foregoing reasons, we AFFIRM the judgment of the district court.